# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

PREVENT DEV GMBH,

  Plaintiff,

  v.

ADIENT PLC; LEAR CORPORATION;
VOLKSWAGEN, AG; and RALF
BRANDSTÄTTER,

  Defendants.

Civil Case No._____

***JURY TRIAL DEMANDED***

Judge:_____

## COMPLAINT

**ZAUSMER, P.C.**
Mark J. Zausmer (P31721)
Mischa M. Boardman (P61783)
32255 Northwestern Highway
Farmington Hills, MI 48334
(248) 851-4111
*mzausmer@zausmer.com*

**BOIES SCHILLER FLEXNER LLP**
Duane L. Loft
Brianna S. Hills
55 Hudson Yards
New York, NY 10001
(212) 446-2300
*dloft@bsfllp.com*

*Attorneys for Plaintiff*

{03289924}

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................4

II.    VENUE AND JURISDICTION ................................................10

III.   PARTIES ...............................................................................13

       A.    Prevent DEV GmbH ...................................................13

       B.    Defendant Adient .......................................................13

       C.    Defendant Lear ..........................................................14

       D.    Volkswagen ................................................................15

       E.    Ralf Brandstätter ........................................................15

IV.    THE MARKET FOR AUTOMOTIVE SEAT COVERS ............16

       A.    The Relevant Supply Chain ........................................17

             **1.**   Tier 3 Suppliers ...............................................17

             2.    Tier 2 Suppliers ...............................................17

             3.    Tier 1 Suppliers ...............................................17

             4.    OEMs .................................................................19

       B.    Defendants' Market Power ..........................................20

             1.    Volkswagen .......................................................20

             2.    Tier 1 Defendants .............................................24

V.     VOLKSWAGEN'S RELATIONSHIP WITH THE TIER 1 DEFENDANTS
       ............................................................................................26

VI.    PLAINTIFF'S HISTORICAL BUSINESS WITH DEFENDANTS ............27

       A.    Plaintiff, and the Prevent Group, Became Threat to Volkswagen and
             Tier 1 Defendants' Market Power. .....................................28

B.    Volkswagen Launches "Project 1"......................................................30

VII.   DEFENDANTS' TORTIOUS AND ANTICOMPETITIVE CONDUCT ...32

A.    Volkswagen Brings the Tier 1 Defendants Into the Project 1 Strategy. ...................................................................................................32

B.    Volkswagen Enters Agreements with Tier 1 Defendants to Boycott Plaintiff Across All Carmakers. ............................................................33

C.    Following Their Agreement, the Tier 1 Defendants Suddenly Oust Plaintiff from Competitive Bidding Process and Stop Purchasing from Plaintiff Across All Carmakers. ............................................................37

VIII.  ANTICOMPETIVE HARM ..........................................................................38

IX.    HARM SUFFERED BY PLAINTIFF FROM DEFENDANTS' MISCONDUCT ...............................................................................................39

X.    LEGAL CLAIMS FOR RELIEF..................................................................40

XI.    REQUEST FOR RELIEF ..............................................................................55

XII.   JURY DEMAND ...........................................................................................56

Prevent DEV GmbH files this Complaint under the antitrust laws of the United States and the State laws of Michigan against Volkswagen AG, Ralf Brandstätter, Adient plc, and Lear Corporation, and alleges the following:

## I.    <u>INTRODUCTION</u>

1.    This case arises out of an unlawful conspiracy between Volkswagen AG, the largest carmaker in the world, and Adient plc and Lear Corporation, the two largest automotive seat makers in the world, to boycott Plaintiff from the automotive seat cover market.

2.    Defendants Adient and Lear are known in the automotive industry as "Tier 1" suppliers.  As relevant here, they supply full automotive seats directly to carmakers like Volkswagen, General Motors, and Daimler.  Plaintiff's business includes operating as a "Tier 2" supplier of seat covers, typically supplying seat covers to the Tier 1 suppliers for inclusion in the complete seat sold to the carmakers.

3.    In 2016, a global dispute arose between Volkswagen and companies affiliated with Plaintiff known as the "Prevent Group."  These companies, in contrast to Volkswagen's traditional network of small and weak suppliers, began negotiating against Volkswagen's prices and terms.  In response, Volkswagen launched "Project 1," a highly organized campaign to "demolish" Plaintiff and the Prevent Group and to exclude them systematically from the market.  Project 1 was

developed and led at the highest levels of Volkswagen, including by Defendant Ralf Brandstätter, then Volkswagen's head of purchasing and now Chief Executive Officer of the Volkswagen brand.

4.      Project 1 had several dimensions, including interfering with acquisitions by Prevent Group companies that might threaten Volkswagen's market power, hiring private investigators to spy on Prevent Group executives to gain insight into the Prevent Group's acquisition strategy and business, and manufacturing negative press about the Prevent Group. These aspects of Project 1 are the subject of separate proceedings both in this District and in certain European courts.

5.      This case is about a conspiracy hatched by the Project 1 group to induce Tier 1 Defendants into a tortious and anticompetitive boycott of Plaintiff in the seat cover market. To carry out the Project 1 strategy of "demolishing" Plaintiff as a supplier of seat covers, Volkswagen approached Tier 1 Defendants with an agreement: boycott Plaintiff from all seat cover business with the Tier 1 Defendants, and in exchange, Volkswagen will award the seat cover business directly to the Tier 1 Defendants, with preferential terms and prices, outside the typical competitive bidding process.

6.      This was an industry-wide boycott agreement. The Tier 1 Defendants would agree to boycott Plaintiff from providing seat covers for vehicles made by

*all* carmakers, not just Volkswagen.  Collectively, the Tier 1 Defendants make

77% percent of all seat cover purchases worldwide.  Accordingly, the effect of

these exclusionary agreements was to starve Plaintiff from the relevant market.

7.     The details of these agreements came to light when a member of the

Project 1 team at Volkswagen decided to go public with what the company had

done.  In July 2020, the press outlet Business Insider began reporting on the inner-

workings of the Project 1 group at Volkswagen, sourcing its reporting to interviews

with an internal member of the Project 1 team.[1]  The reporting was also sourced to

over fifty hours of audio recordings of more than thirty Project 1 meetings from

2017 and 2018, which apparently had been shared with Business Insider.

8.     In 2017, Plaintiff itself had received an anonymous letter and internal

Volkswagen documents, also from a person claiming to have first-hand

information about Volkswagen's Project 1 strategy to destroy Plaintiff and the

Prevent Group.  Representatives of the Prevent Group notified both the German

---

[1] *See* Exhibit 1 (Philip Kaleta et al., *A Bitter Feud Between VW, the World's Largest Car Manufacturer, and a Supplier Culminated in a Wild Scandal, with 50 Hours of Secret Talks Leaked, A 'Spy-Hunt,' and An Apparent Suicide*, BUSINESS INSIDER (Oct. 8, 2020), https://www.businessinsider.com/scandal-putin-kremlin-germany-former-chancellor-prosecutors-audio-leak-volkswagen-2020-7); *see also* Exhibit 2 (Philip Kaleta et al., *VW Bugging Affair: In the Power Struggle with Prevent, Volkswagen Tried to Obtain Pre-emptive Rights or an "Information Obligation" From 217 Suppliers*, BUSINESS INSIDER (Oct. 2, 2020) (original German story)).

Prime Minister of Lower Saxony, the region where Volkswagen AG is located, and the Volkswagen Board about the anonymous letter and internal documents.

9.     Citing the Project 1 audio recordings, Business Insider reported on early 2017 meetings within the Project 1 group discussing the how to redirect Plaintiff's business to Adient:  "In order to **get rid of Prevent** but not endanger production, VW distributed [Prevent Group's] delivery scope to other companies at an early stage—in the background.  Among other things, **Adient was supposed to take over the order for seat covers.**"  Business Insider characterized this revelation as "**Explosive: Adient not only replaced Prevent at VW, the supplier also ended the longstanding cooperation with the [Prevent G]roup of companies**."

10.     After the reporting went public, Volkswagen announced it would conduct an internal investigation to identify the Business Insider source.  A month later, Volkswagen announced that it had identified the source as a Volkswagen "manager."  A month after that, a senior Volkswagen manager was discovered dead in a burned out car.  The local police reported that just a month prior to his death, this man's home had been raided and set on fire while he was out of town with his wife.  This man was later identified as Christian Minkley.  Prosecutors in Germany say they are still actively investigating his "unusual" death, saying that the cause of the fire is still unclear and that they need to "make sure that the vehicle has not been tampered with."

11.     On November 23, 2020, Business Insider published another article, revealing what it called "a dramatic turn" in the story.[2]  The new article revealed that, prior to his death, Minkley left a series of notes that "made serious allegations against VW," including that he made the audio recordings at the direction of his manager, K. Kseniia.  Minkley "apparently did not trust his employer with everything he knew."  With this information, the week of November 16, 2020, prosecutors searched the Volkswagen headquarters for information, collecting "documents and data carriers."

12.     After the public reporting, the pieces of this conspiracy finally came together.  The allegations in this Complaint are based on Business Insider's reporting, the internal Volkswagen documents and information that the Prevent Group representatives received themselves from a Project 1 source, information from other suppliers, and other sources with direct evidence of these facts.

13.     According to these sources, in 2018, Rainer Stutz, then Volkswagen's Group Executive Director of Purchasing, conducted a series of in-person meetings at the Michigan headquarters of Tier 1 suppliers Adient and Lear.  Ralf

---

[2] Exhibit 3 (Jan C. Wehmeyer & Kayan Özgenc, *Turning Point in VW Wiretapping Affair: After the Suicide of A Suspect, The Public Prosecutor's Office Is Now Investigating a Top Manager in Russia*, BUSINESS INSIDER (Nov. 23, 2020), https://www.businessinsider.de/wirtschaft/wende-in-der-vw-abhoeraffaere-nach-dem-selbstmord-eines-verdaechtigen-ermittelt-die-staatsanwaltschaft-nun-gegen-eine-top-managerin-in-russland/ (unofficial translation)).

Brandstätter, then Volkswagen's Chief Operating Officer and Head of

Procurement and current Volkswagen Group Chief Executive Officer, participated

by phone.  During these meetings and phone calls, Defendants formalized their

boycott agreement, under which Volkswagen would replace Plaintiff with Adient

and Lear as Volkswagen's supplier of various automotive component parts,

including seat covers, outside the standard competitive bidding process, in

exchange for Adient and Lear agreeing to boycott products from Plaintiff across all

carmakers.

14.    The effect of this tortious and anticompetitive campaign was felt

immediately.  Until 2018, Plaintiff had received approximately $360 million in seat

cover revenue from Adient and Lear.  In 2018, following the unlawful agreements

with Volkswagen, that revenue virtually disappeared.

15.    These unlawful agreements had the purpose and effect of suppressing

competition and maintaining Defendants' market power in the market for seat

covers.  The harm to competition is straightforward:  As a result of the unlawful

agreements, Plaintiff has been foreclosed from approximately 77% of the global

market for automotive seat covers.  Defendants' conduct directly caused Plaintiff's

foreclosure from the market for automotive seat covers, thereby impairing

competition in that market.  The result is overall reduction in competition in the

automotive seat cover market—a central component for every vehicle in the world.

16.     At the same time, the elimination of Plaintiff allows Volkswagen to enhance and maintain its market power over suppliers through exclusionary means, including by sending a warning to other suppliers about what will happen if they stand up to Volkswagen's anticompetitive terms and prices.

17.     Plaintiff's damages from the lost profits that it would have generated from contracts with the Tier 1 Defendants is currently estimated in excess of $180 million.

## II.     <u>VENUE AND JURISDICTION</u>

18.     This Court has jurisdiction under 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.  Prevent seeks relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26. Jurisdiction is also proper under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different States under 28 U.S.C. § 1332(a)(1), and between citizens of a State and citizens or subjects of a foreign state under 28 U.S.C. § 1332(a)(2).

19.     This Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

{03289924}                                                  10

20.    Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391.  Volkswagen transacts business in the United States, including in this District.  Volkswagen maintains a corporate office in this District and makes vehicle sales to Volkswagen dealers located in this District.  Adient and Lear are each headquartered in this District.  Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.  These effects include:

(a)    Foreclosure of Plaintiff from supplying automotive seat covers, including in the United States;

(b)    Artificial restriction of market output in the automotive seat cover market;

(c)    Artificial increase of the price of automotive seat covers; and

(d)    Artificial restriction of prices and output in the Tier 1 automotive seat market;

21.    Defendants are subject to the personal jurisdiction of this Court because, as alleged in this Complaint:

(a)    Defendants transact business, have continuous or systematic contacts with, or minimum contacts to, the United States and this District sufficient to satisfy due process;

{03289924}                                       11

(b)     Defendants entered into a conspiracy, and performed unlawful acts in furtherance of the conspiracy, in or from this District, including negotiating and executing agreements between Volkswagen and the Tier 1 Defendants to stop purchasing components from Plaintiff in violation of federal and state antitrust law, and state tort law;

(c)     Defendants are amenable to service of process under Federal Rule of Civil Procedure 4(k)(1)(A) and Michigan's long-arm statute, M.C.L. § 600.705, because, as alleged in this Complaint, Defendants transacted business in Michigan and contracted to provide services to be rendered or for materials to be furnished in the State, and did or caused an act to be done that resulted in an action for tort, and because Michigan's long-arm statute extends jurisdiction to the limits of due process and Volkswagen has sufficient minimum contacts with Michigan to satisfy due process; or

(d)     Based on the allegations in this Complaint, Defendants are subject to general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States, including the forum state, and have purposefully availed themselves of the laws of the United States.  As alleged, Defendants engaged in conspiratorial activities and anticompetitive conduct that they intended to have, and did have, direct,

substantial, and reasonably foreseeable effects on commerce throughout the United States, including the forum state.

## III.  PARTIES

### A.  Prevent DEV GmbH

22.    Plaintiff Prevent DEV GmbH is a corporation organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany.

23.    Plaintiff is a separately-incorporated company with its own corporate identity.  It is also affiliated with the Prevent Group, a network of companies that is engaged in the worldwide supply of various automotive component parts.

24.    Plaintiff is recognized as a leading supplier of leather and textiles and is often the price leader in its core business of automotive seat covers.

25.    Plaintiff contracts directly with Tier 1 suppliers and then subcontracts with its operational companies to manufacture and fulfill the orders.  Plaintiff negotiates these contracts, invoices the Tier 1 suppliers, and receives the revenues of the operational entities from those contracts.

### B.  Defendant Adient

26.    Adient plc is a corporation organized and existing under the laws of Ireland, with its principal place of business in Plymouth, Michigan.  Adient is

publicly traded on the Nasdaq exchange.  Adient was formed in 2016 as part of Johnson Control Incorporated's spin-off of its seating business.[3]

27.     As Adient explains on its website, it is "a global leader in automotive seating.  With 83,000 employees in 35 countries, Adient operates 220 manufacturing/assembly plants worldwide.  [Adient] produce[s] and deliver[s] automotive seating for all major OEMs . . . and into more than 23 million vehicles every year."  Adient produces complete seat systems for automotive and other mobility applications, as well as certain components of complete seat systems, such as foam, trim and fabric.

### C.     Defendant Lear

28.     Lear Corporation is a corporation organized and existing under the laws of Delaware with its principal place of business in Southfield, Michigan. Lear is publicly traded on the New York Stock Exchange.

29.     As explained in its annual Securities Exchange Commission filing from 2018, Lear Corporation is "a leading Tier 1 supplier to the global automotive industry [that] suppl[ies] seating, electrical distribution systems and electronic modules, as well as related sub-systems, components and software, to all of the worlds' major automotive manufacturers."

---

[3] Throughout the Complaint, Adient and Johnson Controls are referred to collectively as Adient.

### D.   Volkswagen

30.    Volkswagen AG, or the Volkswagen Group, is a corporation organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany.

31.    The Volkswagen Group is the largest manufacturer of passenger vehicles in the world by sales volume.  The Volkswagen Group markets passenger vehicles under several brands, including Audi, Bentley, Bugatti, Lamborghini, Porsche, SEAT, Škoda, MAN, Scania, and its namesake brand, Volkswagen.  In 2018, it had roughly $258.8 billion in revenue.

### E.   Ralf Brandstätter

32.    Ralf Brandstätter, one of the highest ranking employees in the Volkswagen Group, is currently the Chief Executive Officer of the Volkswagen brand, a role he has had since June 2020.  Since 1993, Brandstätter has been employed by Volkswagen.  He took a position as the head of metal procurement for chassis and powertrain components in 1998 and became the head of procurement for the SEAT brand in 2005.  In August 2018, he was appointed as the Chief Operating Officer for the Volkswagen brand, overseeing all procurement activities.  Brandstätter is domiciled in or near Wolfsburg, Germany.

## IV.   THE MARKET FOR AUTOMOTIVE SEAT COVERS

33.   The average car has tens of thousands of individual component parts. As the Court is no doubt aware, large carmakers (known in the industry as "Original Equipment Manufacturers," or "OEMs"), do not, for the most part manufacture those parts themselves.  Instead, they source parts from an array of automotive component part suppliers across the world.

34.   An automotive seat itself contains many component parts:  the metal seat structure, foam or other padding, and a seat cover made from fabric or leather. Some seats also contain electronics (for moving the seat back and forth, for example), heating components, and airbags.  Automotive seats are a major component of the interior of a passenger vehicle, in terms of safety, aesthetics, and comfort.

35.   The product market relevant to this Complaint is the automotive seat cover market.  In internal documents, Defendants each consider automotive seat covers as a distinct product market.  The market for automotive seat covers is worldwide in geographic scope.  In response to a non-transitory change in terms and prices offered by a supplier of automotive seat covers, a Tier 1 supplier would switch to a supplier in another country.

### A.    The Relevant Supply Chain

36.    The automotive seating market is generally characterized by a three tiered supply chain.

#### 1.    Tier 3 Suppliers

37.    At the beginning of the supply chain are Tier 3 suppliers.  Tier 3 suppliers sell raw, or nearly raw, materials like metal, plastic, textiles, and leather.

#### 2.    Tier 2 Suppliers

38.    Tier 3 suppliers sell those raw materials to Tier 2 suppliers.  Tier 2 suppliers use those materials to make component parts, although some Tier 2 suppliers are vertically integrated and themselves produce the necessary raw materials.  Tier 2 suppliers often specialize, focusing on manufacturing a particular part or class of parts.  A supplier of interior electronics, for example, is a Tier 2 supplier.  Tier 2 suppliers typically sell their components to Tier 1 suppliers.

39.    As relevant here, Plaintiff operated as a Tier 2 supplier of automotive seat covers.

#### 3.    Tier 1 Suppliers

40.    Tier 1 suppliers incorporate the Tier 2 seat covers into a complete seat, which includes other seating components, including metal seating frame and seating electronics.  Tier 1 suppliers then sell the seat structure directly to OEMs.

41.    OEMs often negotiate purchase prices, quantities, logistics, and technical product specifications with Tier 1 suppliers several times over the duration of a contract.

42.    Competition among suppliers typically occurs through the Request for Quote ("RFQ") process.  Tier 1 suppliers contract directly with carmakers, or in industry terminology Original Equipment Manufacturers ("OEMs"), to produce a specific product.  As relevant here, for example, Tier 1 suppliers will contract with OEMs to produce an entire seat for a particular model of vehicle.  This process is conducted using RFQs, in which the OEM will send out RFQs to various Tier 1 suppliers.  Tier 1 suppliers in turn submit an estimate for the price of the finished product.  To do so, the Tier 1 suppliers will conduct their own RFQ process for Tier 2 and Tier 3 suppliers to make the components necessary to meet the Tier 1's contract obligations with the OEM.  Suppliers typically receive and respond to hundreds of RFQs every year, only a portion of which they will win.  Receiving a large number of RFQs is thus necessary to remain competitive in the industry.[4] After the Tier 1 or the OEM receives the responses to their RFQs, price is by far the most important factor.

---

[4] *See generally* CENTER FOR AUTOMOTIVE RESEARCH, *The Strategic Value of Information in the FRQ Response Process*, Aug. 2007, http://www.cargroup.org/wp-content/uploads/2017/02/THE-STRATEGIC-VALUE-OF-INFORMATION-IN-THE-RFQ-RESPONSE-PROCESS.pdf.

43.    Both Adient and Lear are Tier 1 suppliers of automotive seats, together accounting for the vast majority of the market share.  Other Tier 1 suppliers in the automotive seating market include Faurecia, a French automotive parts supplier, and Magna International, a Canadian automotive parts supplier.

44.    Adient produces and assembles automotive seats, including at seven locations in Michigan, and five locations in Tennessee, all within approximately 150 miles of Volkswagen's assembly plant in Chattanooga, Tennessee.  Lear produces and assembles automotive seats at approximately 20 facilities in the United States, including five locations in Michigan and one location in Morristown, Tennessee, about 150 miles from Volkswagen's assembly plant in Chattanooga, Tennessee.

### 4.    OEMs

45.    OEMs are at the final level of the supply chain.  These end product manufacturers design, assemble, and market vehicles for sale to consumers. Volkswagen is an OEM.

46.    OEMs generally purchases finished seat structures directly from Tier 1 suppliers, rather than contracting directly with Tier 2 suppliers of seat covers and other seating components.

### B. Defendants' Market Power

#### 1. <u>Volkswagen</u>

47.     Volkswagen has so-called "monopsony power" in the market for automotive component parts, including in the relevant product markets. Monopsony power exists when a buyer, rather than a seller, has power in the purchasing market sufficient to restrain competition, including the power to force a supplier to do something that the supplier would not do in a competitive market.

48.     Buyers with such monopsony power can restrict output and lower prices and terms below competitive levels.  In response to these suppressed prices and terms, suppliers must lower their output—that is, produce fewer components. With fewer units of various automotive component parts available, OEMs reduce the quality and increase the price of their end product (here, passenger vehicles), which harms end-consumers in the long run.

49.     Volkswagen's monopsony power is apparent from its ability to impose infracompetitive—that is, below market level—prices and terms on its suppliers.

50.     *First*, Volkswagen required struggling suppliers, which were heavily reliant on Volkswagen's business, to sell finished components at prices below the suppliers' cost of production, and in some instances below the price those

manufacturers paid for the raw materials.  Those suppliers effectively subsidized every component part sold to Volkswagen.

51.     For example, Volkswagen required a supplier called Rioglass to sell components at a price below the cost of raw materials.  This period of infracompetitive pricing persisted for about two and a half years, including after price renegotiations, without Rioglass switching production capacity to a different OEM.  The same was true for Eybl Austria, which Volkswagen required to accept prices below the cost of making the finished component.  These infracompetitive prices were often exacerbated by required annual price cuts, which Volkswagen successfully imposed on its suppliers.

52.     *Second*, Volkswagen conditioned continued business on suppliers making certain technical product changes.  For example, Volkswagen would issue a demand to the supplier that it manufacture certain portions of a seat using lower quality leather.  Within days of the demand, Volkswagen would lower the price it would pay for seats to reflect the lower-cost product.  Volkswagen then refused to purchase already-produced unchanged goods at the original agreed upon price. The effect of this conduct was to artificially lower the price of the component parts.

53.     In other instances, Volkswagen would require a charge that increased the material cost of the part while forcing the supplier to bear those increased costs.

Volkswagen would issue a demand for the product change—for thicker steel, for example. Then suppliers manufactured the costlier products, but Volkswagen would refuse to pay a higher price for the higher-quality parts, forcing suppliers to bear the full cost of the improvement. The effect of this behavior is to artificially lower the price of the improved goods.

54. *Third*, Volkswagen calculated the price it would pay using a method that systematically drove prices below competitive levels. This method, used in Volkswagen's RFQs, did not include the depreciation cost of plants and equipment, the cost of modifying a plant to meet the technical demands of Volkswagen, or various unanticipated costs. In other words, Volkswagen refuses to account for any unanticipated change in costs over the life of contract, for example, rising costs of essential inputs like labor, raw materials, or energy. The calculation method also did not include, for example, indemnity for suppliers for the costs of winding down a plant when Volkswagen unexpectedly cancelled or dramatically reduced its demand. Requiring suppliers to bear the full risk and cost of these changes can quickly lead to suppliers being forced to produce components at a loss.

55. *Fourth*, Volkswagen required suppliers to pay what it called "Quick Savings," which are large upfront payments suppliers must pay to be awarded a new Volkswagen contract. These upfront payments were not included in

Volkswagen's RFQs, meaning the supplier did not recoup the cost of the payment during the contract period.  One German researcher discussed this business practice, noting that "[t]he motor vehicle industry is especially prone to corruption because of business practices that encourage suppliers to put up large sums to win contracts . . . ."

56.    *Fifth*, Volkswagen required suppliers to enter multi-year contracts under which Volkswagen required suppliers to make annual 3% price cuts, without considering inflation or increased cost of materials.  This pricing strategy is used to artificially reduce the purchase price for component parts.  When a Tier 1 supplier like Adient or Lear was contracting with Volkswagen directly, the Tier 1 supplier passes on any required price reductions to the Tier 2 and Tier 3 suppliers, which thus bear the costs of any price reductions.

57.    Volkswagen was able to achieve these infracompetitive prices and terms across its supplier base, including in the relevant product markets.  The effect of these prices and terms was to drive the price of automotive component parts below levels that would exist in a competitive market.

58.    All of this establishes Volkswagen's durable ability to impose prices and terms that suppliers would not accept in a competitive market—a hallmark of market power.

     2.    <u>Tier 1 Defendants</u>

59.    The Tier 1 Defendants, Adient and Lear, collectively account for about 77 percent of purchases of automotive seat covers worldwide.

60.    In its own words, Adient explained in a quarterly Securities Exchange Commission filing in 2018 that:

> Adient is ***the world's largest automotive seating supplier***. Adient has a leading market position in the Americas, Europe and China, and has longstanding relationships with the largest global original equipment manufacturers, or OEMs, in the automotive space.  Adient's proprietary technologies extend into virtually every area of automotive seating solutions, including complete seating systems, frames, mechanisms, foam, head restraints, armrests, trim covers and fabrics.  Adient is an independent seat supplier with global scale and the capability to design, develop, engineer, manufacture, and deliver complete seat systems and components in every major automotive producing region in the world.

61.    In an August 2017 investor presentation, Adient estimated that its global OEM market share in the automotive seating market was 56%, with higher market share across European OEMs (70%) and North American OEMs (77%).

62.    Similarly, in its annual Securities Exchange Commission filing from 2018, Lear notes that "[b]ased on independent market studies and management estimates, we believe that we hold the #2 position in seat systems assembly globally on the basis of revenue with strong positions in all major markets.  We estimate the global seat systems market at more than $65 billion in 2017.  We are a

leading supplier of various components produced for complete seat systems.  Our primary competitor in this segment globally is Adient, plc."

63.    In a January 2017 investor presentation, Lear estimated its overall market share the seat assembly market—that is, the Tier 1 complete seat market— at 22%, with larger market share in the North and South American geographic markets.

64.    Importantly, over the last decade, both Tier 1 Defendants have vertically integrated and now compete not only in the market for full seats, but also in the market for seat covers.  As demonstrated in the below slide from that presentation, Lear competes in the Tier 2 markets for seat covers, in which it has a 17% overall market share, and a 30% market share in the leather seat cover market.



65.    Adient is similarly vertically integrated and competes directly with Plaintiff in the Tier 2 automotive seat cover market.  In its annual S.E.C. filing

from 2018, Adient explains: "Adient is a global leader in complete seat assembly and ***one of the largest in all major seating components***, operating manufacturing plants that produce seating foam, metal structures, fabrics, ***seat covers*** and seat mechanisms."

## V.   VOLKSWAGEN'S RELATIONSHIP WITH THE TIER 1 DEFENDANTS

66.     In 2017 and 2018, Adient reported that Volkswagen was one of its "most significant" customers, comprising roughly 11% of its net sales. Volkswagen and Adient worked closely on the development of products, and Volkswagen considered, and still considers, Adient to be one of its most important suppliers.  For example, in 2010, Volkswagen awarded Adient the Volkswagen Group Award for the best performance among its suppliers, and routinely appointed Adient to its list of premium suppliers.  Today, Volkswagen is Adient's largest customer.

67.     Lear similarly had a strong relationship with Volkswagen, particularly through Lear's acquisition of Grupo Antolin Automotive's seating business in April 2017.  In 2014, for example, Grupo Antolin held a presentation for Volkswagen executives aimed at including its seats in Volkswagen vehicles.  In attendance for Volkswagen were Rainer Stutz, then Volkswagen Group Executive Director of Purchasing, Jens Graumann, Volkswagen Purchasing Manager, and various other purchasing managers and technical personnel from Volkswagen.

Lear's acquisition of Grupo Antolin further strengthened the relationship between Lear and Volkswagen.

68.    Like Adient, Lear regularly received awards from Volkswagen recognizing the close relationship between the Tier 1 supplier and Volkswagen.

## VI.   PLAINTIFF'S HISTORICAL BUSINESS WITH DEFENDANTS

69.    At its inception in the early 1990s, Plaintiff's small manufacturing business largely involved cutting and sewing leather and textile seat covers.

70.    The relationship between Plaintiff and Adient goes back to late 1990s and early 2000s.  The business cooperation between Plaintiff and Adient started in seat covers and, when Plaintiff expanded its product portfolio, continued to expand in the 2010s to include metal seat structures, leather, and fabrics.  At one point, Adient was the single largest customer of both Plaintiff and across the entire automotive business of the wider Prevent Group.  At the same time, Prevent Group companies would purchase some components from Adient in markets in which Adient was acting as a Tier 3 supplier, including certain fabrics.  In addition, the Prevent Group also provided major product development and pre-serial production services to several of Adient's operations.  The relationship between Plaintiff and Adient was highly successful.

71.    From 2015 to 2017, Plaintiff sold between 75 and 85 million euros (about $88–100 million) per year in seat covers to Adient.  Plaintiff sold seat

covers to Adient for the Volkswagen Passat, a vehicle that Volkswagen assembles at its Chattanooga, Tennessee, assembly plant.

72.     Like with Adient, Plaintiff maintained a strong relationship with Lear. Plaintiff consistently supplied Lear with about 8 million euros (about $9 million) per year in seat covers from 2015 to 2017.  Seat covers sold by Plaintiff to Lear included covers for several Audi, Porsche, and BMW models, among others.

73.     Both Adient and Lear consistently sent RFQs to Plaintiff, acknowledging Plaintiff's high quality products, on-time delivery, and price leadership, compared to other Tier 2 suppliers of automotive seat covers.  Plaintiff and Tier 1 suppliers typically entered into long-term contracts lasting the entire production cycle of a particular vehicle model, typically between five and seven years.

A.     **Plaintiff, and the Prevent Group, Became Threat to Volkswagen and Tier 1 Defendants' Market Power.**

74.     In the early 2000s, Tier 1 suppliers began buying Plaintiff's components to use in Volkswagen and other OEM vehicles.

75.     At the time, Plaintiff was a mid-size supplier heavily dependent on Volkswagen's business.  Exploiting the dependence of the Prevent Group on its business, Volkswagen frequently required Plaintiff to make price reductions, consistent with Volkswagen's usual practice described above.  In order to maintain its relationship with Volkswagen, Plaintiff accommodated these price reductions.

76.     Volkswagen Group purchased Plaintiff's component parts for incorporation in several of its passenger vehicles: Golf A7, Audi Q3, Passat, Touran, Touareg, Tiguan, Skoda Octavia, Porsche Cayenne and Audi A1. Volkswagen Group assembled these vehicles, which incorporated Plaintiff's component parts, in Europe and sold them globally, including in the United States.

77.     Plaintiff continued to grow in both size and product scope.  Plaintiff sourced much of its own materials, including leather from its tannery and metal from its foundries.  By the 2010s, Plaintiff was responsible for a large majority of the automotive seat covers in Volkswagen brand vehicles manufactured in Europe.

78.     As Plaintiff grew, it achieved more bargaining power to insist upon competitive prices and terms, directly threatening Volkswagen's strategy of keeping its suppliers small and weak and thereby allowing Volkswagen to force anticompetitive prices and terms on those suppliers.  Entities within the Prevent Group began acquiring smaller, weak suppliers.  This posed a direct threat to Volkswagen's market power strategy.  Volkswagen could no longer force its suppliers to accept terms and prices below competitive levels.  And this risk was especially acute at a time when Volkswagen was dealing with the fallout of the Dieselgate scandal.  A dispute between the companies broke out in 2016 over an alleged supply stoppage, a standoff the European press characterized as a "David versus Goliath" narrative indicating a potential change in the power dynamics

between OEMs and their supply chains.  That dispute has been the subject of
ongoing, unrelated litigation between Volkswagen and other Prevent Group
companies.

### B.    Volkswagen Launches "Project 1"

79.    Volkswagen addressed the threat of Plaintiff and the Prevent Group
with an organized, methodical, and institutional response.  At the highest levels of
the Volkswagen Group, Volkswagen commenced a series of meetings under the
code-name "Project 1."[5]

80.    Defendant Ralf Brandstätter led Project 1, overseeing both its
planning and execution.  Brandstätter often reported on Project 1 developments to
the Volkswagen Board, including giving the Board detailed updates on the
progress of Project 1 and personally communicating, and in some instances
coordinating these efforts, with Herbert Diess, the current Chairman of the
Volkswagen Management Board.

81.    As reported in Business Insider, "[t]he name of the new chairman of
Volkswagen's board, Ralf Brandstätter, is mentioned multiple times in the

---

[5] The source for the internal Volkswagen documents referenced herein,
including the Project 1 documents, is a senior Volkswagen executive with first-
hand knowledge of the internal documents and events alleged herein and whose
identity has been concealed to protect against retaliation by the Company.  Quotes
of written Volkswagen materials throughout the Complaint are unofficial
translations from German.

recordings" of Project 1 meetings and "the name of Ralf Brandstätter kept coming up" including in "Documents seen by Business Insider Deutschland suggest[ing] that Brandstätter regularly acted as an intermediary between Project 1 and the chairman of the board of management of Volkswagen Group, Herbert Diess." For example, multiple press outlets, including the Business Insider, have published an image of an August 2016 Project 1 Meeting in which Brandstätter is listed as being "in charge" of Project 1. Brandstätter's role as the mastermind of Project 1 is confirmed by internal Project 1 documents, which indicate that he both personally conducted and ordered others to carry out Project 1 initiatives.

82.    Project 1 was highly confidential. Members of the group were instructed to destroy documents and communications related to the scheme.

83.    Project 1 had an explicit focus: to remove Plaintiff from the market, not just as a supplier for Volkswagen components, but across all carmakers, and thereby deter remaining suppliers from posing any similar threats to Volkswagen's market power. This goal is confirmed by internal Project 1 presentations, which refer to the "destruction" and "demolition" of Plaintiff and the Prevent Group.

84.    Entering agreements with the Tier 1 suppliers was part of that strategy. In an internal Project 1 document from February 2016, a slide detailing the "Demolition Scenario" for a then subsidiary of Plaintiff lists Lear, Adient, and Faurecia as possible replacement suppliers.

85.    The Project 1 strategy was then to use this offer of replacement business to extract agreements from the Tier 1 Defendants designed to ensure that Plaintiff would be eliminated from the market for good.

## VII.    DEFENDANTS' TORTIOUS AND ANTICOMPETITIVE CONDUCT

### A.    Volkswagen Brings the Tier 1 Defendants Into the Project 1 Strategy.

86.    In an internal Project 1 presentation from February 2017, Volkswagen lists the Tier 1 Defendants on a slide called "Prevent - exit scenarios, Necessary Information Provision and Nondisclosure Agreements," suggesting that Volkswagen entered non-disclosure agreements with the Tier 1 Defendants related to Project 1.

87.    In an internal Project 1 presentation from January 2017 discussing how to replace Plaintiff as a supplier, Volkswagen noted: "The commissioning of the alternative suppliers entails extensive investments to the tune of millions of euros for the alternative suppliers."  The presentation notes that Ralf Brandstätter, the current Chief Executive Officer of Volkswagen, was tasked with managing the completion of the replacement.  Volkswagen estimated that the replacement of Prevent Group companies, including Plaintiff, would cost it roughly 200 million euros.  These anticipated costs mainly included legal costs of defending lawsuits for its misconduct.

88.     The replacement of all Prevent Group companies, including Plaintiff, as suppliers to Volkswagen was approved at the highest levels of the company.  In a November 2016 Project 1 presentation, Volkswagen writes that, "In accordance with a resolution by the Management Board, alternative suppliers and safeguards have been developed and in some cases, already commissioned for the companies of the Prevent Group. These measures are currently being implemented."

89.     Because the new suppliers were not large or efficient enough to cover the entire production volume, Volkswagen decided to build up a "safety stock" of Plaintiff's components before it cancelled all of its contracts with Plaintiff. Volkswagen needed somewhere to store all of these parts.  An internal Project 1 presentation from November 2016 reveals that Volkswagen relied on Lear and Adient to store the products, including Plaintiff's seat covers.  Volkswagen paid approximately 119,000 euros per month to store Plaintiff's products at the Tier 1 warehouses.

### B.     Volkswagen Enters Agreements with Tier 1 Defendants to Boycott Plaintiff Across All Carmakers.

90.     The design of Project 1 was to eliminate Plaintiff from the market and destroy the company.  To do this, Volkswagen had to ensure that Plaintiff was not only replaced as a supplier to Volkswagen, but also prevented from supplying seat covers to other carmakers.  As reported by Business Insider, Volkswagen knew that directly excluding Plaintiff from the bidding process would be too obvious

because it would both be counter to their own business interests and "smell[] too much like an agreement."   According to Business Insider, quoting the recordings from the Project 1 meetings:

> During one recorded session, a manager asked, "How do we modify the bidding lists so that we don't end up asking Prevent separately?" [ . . . ]

> "Prevent produces at dumping prices, would be the cheapest supplier, and would thus move up the lists," another manager on the recording said.

> "In this case, one would have to decide not to proceed according to the 'best bid' principle," another Volkswagen manager said.

> Removing Prevent from the bidding list would be "very suspicious."

> "It smells too much like an agreement," another said.

91.    To avoid these problems, Volkswagen came up with a solution. Together controlling over 70% of the market for automotive seats, Adient and Lear could effectively foreclose Plaintiff from the market.  This move was against Volkswagen's rational economic interest:  Volkswagen admits in the audio recordings that Plaintiff was the cheapest, most efficient competitor and would have won new contracts had it been allowed to bid on them.

92.    Nonetheless, Volkswagen was willing to sacrifice its short term economic interest if it meant serving its long-term goal of eliminating Plaintiff from the market.  According to information made available to Plaintiff, Volkswagen approached all four major Tier 1 suppliers of automotive seats --

Adient, Lear, Magna, and Faurecia -- with a proposed agreement to boycott

Plaintiff across all carmakers in exchange for guaranteed future seat cover

contracts, including on contracts Volkswagen presently had with Plaintiff.  Magna

declined to enter into the illicit agreement.  Faurecia also declined, but did

temporarily reduce the number of contracts entered into with Plaintiff, anticipating

that Plaintiff might go bankrupt as a result of the boycott.  Defendants Adient and

Lear, on the other hand, agreed.

93.     With respect to Adient, Volkswagen representatives, including Head

of Group Procurement for Interior, Rainer Stutz, had meetings with the then-Chief

Executive Officer and Chairman of Adient, R. Bruce McDonald, at Adient's

headquarters in Plymouth, Michigan.  Ralf Brandstätter, the Volkswagen executive

that oversaw much Project 1, also had phone calls with Adient and Lear

representatives related to the boycott.

94.     Employees of Adient and Lear regularly met with C-suite level

executives from Volkswagen in Michigan and discussed Project 1 initiatives and

measures.

95.     Volkswagen and the Tier 1 Defendants had multiple other

opportunities to meet to enter, discuss, or enforce their agreements.  For example,

Volkswagen, Adient, and Lear attended and presented at the Deutsche Bank Global

Auto Industry Conference on January 16–17, 2018, at the MGM Grand Hotel in

Detroit, a small, invite-only conference for automotive suppliers.  In attendance were:  Frank Witter, Volkswagen's Chief Financial Officer; R. Bruce McDonald, Adient's Chairman and Chief Executive Officer; Jeff Stafeil, Adient's Chief Financial Officer; Matt Simoncini, Lear's President and Chief Executive Officer; Jeff Vanneste, a Lear Senior Vice President; and Ray Scott, a Lear Vice President and the President of Seating.

96.     At the time, Adient was struggling financially.  During Adient's presentation at the conference, Chief Financial Officer Jeff Stafeil said:  "So we've got a lot of work to do.  Quite honestly it's a crisis in terms of our performance in this business, so highly focused on getting this thing out of the sick ward as quick as we can, but at the same time looking at other actions that we can take to minimize the impact this year and that will contribute to the longer—our margin expansion goals in the future."

97.     In return for agreeing to foreclose Plaintiff from the market, Adient and Lear would get lucrative contracts to replace Plaintiff as Volkswagen's seat cover supplier without having to conduct an open bidding process.  For Adient and Lear, the deal was a win-win.  Not only would they earn higher margins for the replacement seat covers sold to Volkswagen outside of the normal competitive bidding process, but suffocating Plaintiff would mean one less competitor in the seat cover market.

C.      **Following Their Agreement, the Tier 1 Defendants Suddenly Oust Plaintiff from Competitive Bidding Process and Stop Purchasing from Plaintiff Across All Carmakers.**

98.     In 2018, armed with their agreement with Volkswagen, Adient and Lear abruptly cut all ties with Plaintiff.  Adient and Lear stopped sending any RFQs for potential new business, effectively cutting Plaintiff out by depriving Plaintiff the opportunity to bid on new projects.

99.     This behavior was in stark contrast to a number of other leading Tier 1 suppliers, such as Magna and Faurecia, and in stark contrast to the relationship between Plaintiff and the Tier 1 Defendants before 2018.  Since that time, Plaintiff has received no new RFQs from Adient.  Adient even refused to respond to any emails or calls from Prevent Group representatives about the reason Plaintiff stopped receiving RFQs.

100.    The below chart represents the dramatic decline in sales to the Tier 1 Defendants after 2018, compared with the sales to the other major Tier 1 supplier, Magna, which remained consistent to present day.  The approximate date of the conspiracy, mid-2018, is represented by the vertical line below.  Although some revenue continued from previous contracts before the conspiracy, revenue from Lear and Adient dropped off dramatically following the agreements with

Volkswagen, reducing to nothing by 2020.



## VIII. <u>ANTICOMPETIVE HARM</u>

101.    The harm to competition in this case is straightforward.  As explained in a leading antitrust treatise:  "The standing of a directly foreclosed supplier is usually clear—such as when the plaintiff's potential customers agree to patronize only a rival supplier.  Such a restraint is illegal, if at all, because it forecloses so much patronage from rival suppliers as to weaken competition in the supplying market.  This rationale explicitly covers the injury suffered by the plaintiff." Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶ 350e (4th ed. 2013–18).

102.   Here, Defendants' agreements directly foreclosed Plaintiff's ability to compete in the market for automotive seat covers by cutting off Plaintiff's access to roughly 77% of that market.

103.   When a competitor is foreclosed from a market—particularly where, as here, Volkswagen admits that Plaintiff was the most cost efficient competitor in that market—the result is to substantially lessen price competition in that market. With less price competition, the price of automotive seat covers rises across the market, and there is an overall reduction in output in that market.

104.   Automotive seat covers are an important and necessary component for every passenger vehicle sold in the world.  Defendants' conduct raised the price and reduced the output of seat covers, making it more expensive for every supplier, carmaker, and consumer that purchases them—either as a component or, in the case of consumers, in a finished vehicle.

105.   The increased price, reduced output, and reduced quality for seat covers affected vehicles sold in the United States.  Both Adient and Lear produced seats for vehicles sold in the United States, including Volkswagen vehicles.

## IX.   HARM SUFFERED BY PLAINTIFF FROM DEFENDANTS' MISCONDUCT

106.   Facing an enormous loss in revenue from the loss of contracts with the Tier 1 Defendants, Plaintiff's business suffered dramatically.

107.   Prior to the unlawful agreements, Plaintiff's revenue from seat cover sales to Adient and Lear totaled approximately $360 million, with approximate yearly profits of $19 million.  As a result of Defendants' tortious and anticompetitive conduct, Plaintiff was deprived of those profits.

108.   At present value, Plaintiff's damage based on those lost profits will be proven at trial, but is currently estimated to be in excess of $180 million.  This estimate is based on lost profits using revenues from the Tier 1 Defendants projected out seven years, which, as discussed above, is a typical contracting period.  For example, the Golf 7, the model for which Adient replaced Plaintiff as supplier to Volkswagen, was manufactured for about seven years.

109.   In addition to lost business from the Tier 1 Defendants, the dramatic decrease in production also caused Plaintiff to be unable to maintain the scale necessary to offer low prices in the automotive seat cover market.

110.   By foreclosing Plaintiff from capturing these returns, Defendants caused loss to Plaintiff's industry goodwill and market reputation, and substantially decreased the overall market valuation of the Prevent Group.

## X.    LEGAL CLAIMS FOR RELIEF

### CLAIM 1:  VIOLATION OF SHERMAN ACT § 1, AGREEMENT IN RESTRAINT OF TRADE AGAINST ALL DEFENDANTS

111.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

112.   As alleged, Defendants have engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for automotive component parts.  Volkswagen expressly agreed with each of the Tier 1 Defendants not to purchase products from Plaintiff across all OEMs.

113.   Defendants' conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as an unreasonable restraint of trade.

114.   Defendants' conduct is per se unlawful under federal antitrust law. Alternatively, Defendants' conduct is an unreasonable restraint of trade under the rule of reason.

115.   The relevant market is the worldwide market for automotive seat covers.

116.   The Tier 1 Defendants each have market power in that relevant market.

117.   Defendants have committed at least one overt act in furtherance of the conspiracy alleged in this Complaint.

118.   Defendants' actions as part of, and in furtherance of, their contracts, combinations, or conspiracies in restraint of trade were authorized, ordered, or done by one or more of Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

119.    Defendants' anticompetitive acts had, and continue to have, substantial, unreasonable, and foreseeable effects on interstate commerce in the automotive component part market, including in each of the relevant product sub-markets.  These anticompetitive effects include:

(a)    Artificial suppression of competition in the market for automotive seats;

(b)    Artificial reduction in market output and supracompetitive prices for automotive seat covers; and

(c)    Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market.

120.    Any competitive benefits from Defendants' conduct do not outweigh the actual and likely anticompetitive effects of the agreements.  Any possible procompetitive benefits of the agreements between Defendants could have been achieved by less restrictive alternatives.

121.    Plaintiff was harmed, and continues to be harmed, as a result of Defendants' anticompetitive conduct.  Plaintiff suffered antitrust injury through:

(a)    Substantial foreclosure from the market for automotive seat covers;

(b)    Artificial suppression of competition in the market for automotive seats;

(c)     Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)     Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)     Decreased productive efficiency through loss of economies of scale and scope.

122.   The injury to Plaintiff was a foreseeable consequence of Defendants' anticompetitive agreements.

## CLAIM 2:  VIOLATION OF SHERMAN ACT § 2, MONOPOLIZATION AGAINST ADIENT AND LEAR

123.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

124.   The relevant markets are the worldwide automotive seat market and the worldwide automotive seat cover market.

125.   The Tier 1 Defendants each have market power in the automotive seat market, and monopsony power in the automotive seat cover market.

126.   Defendants' market power is not the consequence of a superior product, business acumen, or historical accident.  Instead, Defendants' market power stems from their anticompetitive conduct, including their anticompetitive agreements to foreclose Plaintiff from the automotive seat cover market, which

unreasonably restrains trade in that market and in the market for automotive seats. Defendants therefore willfully acquired or maintained their market power.

127.   There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs the anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

128.   Defendants' willful acquisition or maintenance of its market described in this Complaint injured, and continues to injure, Plaintiff in its business or property.  Prevent suffered antitrust injury through:

(a)   Substantial foreclosure from the market for automotive seat covers;

(b)   Artificial suppression of competition in the market for automotive seats;

(c)   Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)   Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)   Decreased productive efficiency through loss of economies of scale and scope.

129.   The injury to Plaintiff was a foreseeable consequence of Defendants' willful maintenance or acquisition of their market power.

## CLAIM 3:  VIOLATION OF SHERMAN ACT § 2, ATTEMPTED MONOPOLIZATION AGAINST ADIENT AND LEAR

130.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

131.   In the alternative to the Claim 2, the Tier 1 Defendants attempted to monopolize the automotive seat market and the automotive seat cover market.

132.   The relevant markets are the worldwide automotive seat market and the worldwide automotive seat cover market.

133.   Tier 1 Defendants restrained trade in the automotive seat market and automotive seat cover market by foreclosing Plaintiff from competition in that market.  This conduct was both predatory and anticompetitive.

134.   The Tier 1 Defendants had a specific intent to monopolize the automotive seat market and the automotive seat cover market.

135.   There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs its anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

136.   Tier 1 Defendants had a dangerous probability of achieving monopoly power.

137.   As a direct and proximate result of Defendants' predatory and anticompetitive conduct, Plaintiff suffered injury through:

(a)     Substantial foreclosure from the market for automotive seat covers;

(b)     Artificial suppression of competition in the market for automotive seats;

(c)     Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)     Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)     Decreased productive efficiency through loss of economies of scale and scope.

138.   The injury to Plaintiff was a foreseeable consequence of Defendants' anticompetitive conduct, which was done with the intent of monopolizing the relevant markets.

### CLAIM 4:  VIOLATION OF MICHIGAN ANTITRUST LAW, M.C.L. § 445.772, AGREEMENT IN RESTRAINT OF TRADE AGAINS ALL DEFENDANTS

139.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

140.   The agreements between Volkswagen and Tier 1 Defendants unreasonably restrain trade and commerce throughout the State of Michigan in violation of Section 2 of the Michigan Antitrust Reform Act, M.C.L. § 445.772.

141.   As alleged, Defendants engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for automotive component parts.  Volkswagen and the Tier 1 Defendants expressly agreed to foreclose Plaintiff from the relevant markets across all carmakers.

142.   Defendants' conduct is per se unlawful under the Michigan Antitrust Reform Act.  Alternatively, Defendants' conduct is an unreasonable restraint of trade under the rule of reason.

143.   Defendants have committed at least one overt act in furtherance of the conspiracy alleged in this Complaint.

144.   Defendants' actions as part of, and in furtherance of, its contracts, combinations, or conspiracies in restraint of trade were authorized, ordered, or done by one or more of Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

145.   Defendants' anticompetitive acts had, and continue to have, substantial, unreasonable, and foreseeable effects on interstate commerce in the automotive component part market, including in each of the relevant product sub-markets.  These anticompetitive effects include:

(a)   Substantial foreclosure from the market for automotive seat covers;

(b)    Artificial suppression of competition in the market for automotive seats;

(c)    Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)    Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)    Decreased productive efficiency through loss of economies of scale and scope.

146.    Any competitive benefits from the conduct of Defendants do not outweigh the actual and likely anticompetitive effects of the agreements.  Any possible procompetitive benefits of the agreements could have been achieved by less restrictive alternatives.

147.    Plaintiff was harmed, and continues to be harmed, as a result of Defendants' anticompetitive conduct.  Plaintiff suffered antitrust injury through:

(a)    Substantial foreclosure from the market for automotive seat covers;

(b)    Artificial suppression of competition in the market for automotive seats;

(c)    Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)     Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)     Decreased productive efficiency through loss of economies of scale and scope.

148.   The injury to Plaintiff was a foreseeable consequence of Defendants' anticompetitive agreements.

### CLAIM 5:  VIOLATION OF MICHIGAN ANTITRUST LAW, M.C.L. § 445.773, MONOPOLIZATION AGAINST ADIENT AND LEAR

149.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

150.   Defendants' conduct unreasonably restrains trade and commerce throughout the State of Michigan in violation of Section 3 of the Michigan Antitrust Reform Act, M.C.L. § 445.773 because Defendants monopolized the relevant markets.

151.   The relevant markets are the worldwide automotive seat market and the worldwide automotive seat cover market.

152.   Defendants had market power in the relevant markets.

153.   Defendants' market power is not the consequence of a superior product, business acumen, or historical accident.  Instead, Defendants' market power stems from their anticompetitive agreements, including their anticompetitive

foreclosure of Plaintiff from the automotive seat cover market.  Defendants therefore willfully acquired or maintained their market power.

154.   There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs the anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

155.   Defendants' willful acquisition or maintenance of market power described in this Complaint injured, and continues to injure, Plaintiff in its business or property.  Plaintiff suffered antitrust injury through:

(a)   Substantial foreclosure from the market for automotive seat covers;

(b)   Artificial suppression of competition in the market for automotive seats;

(c)   Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)   Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)   Decreased productive efficiency through loss of economies of scale and scope.

156.   The injury to Plaintiff was a foreseeable consequence of Defendants' willful maintenance or acquisition of their market power.

## CLAIM 6:  VIOLATION OF MICHIGAN ANTITRUST LAW, M.C.L. § 445.773, ATTEMPTED MONOPOLIZATION AGAINST ADIENT AND LEAR

157.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

158.   In the alternative to Claim 5, Tier 1 Defendants' conduct unreasonably restrains trade and commerce throughout the State of Michigan in violation of Section 3 of the Michigan Antitrust Reform Act, M.C.L. § 445.773 because Tier 1 Defendants attempted to monopolize the relevant markets.

159.   The relevant markets are the worldwide automotive seat market and the worldwide automotive seat cover market.

160.   Defendants restrained trade in the automotive seat cover market by foreclosing Plaintiff from competing in that market.  This conduct was both predatory and anticompetitive.

161.   Tier 1 Defendants had a specific intent to monopolize the relevant markets.

162.   There is no procompetitive justification for Tier 1 Defendants' anticompetitive conduct that outweighs the anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

163.   Tier 1 Defendants had a dangerous probability of achieving monopsony power.

164.  As a direct and proximate result of Tier 1 Defendants' predatory and anticompetitive conduct, Plaintiff suffered injury through, among other things:

(a)  Substantial foreclosure from the market for automotive seat covers;

(b)  Artificial suppression of competition in the market for automotive seats;

(c)  Artificial reduction in market output and supracompetitive prices for automotive seat covers;

(d)  Artificial reduction in innovation and quality in both the automotive seat market and the automotive seat cover market; and

(e)  Decreased productive efficiency through loss of economies of scale and scope.

165.  The injury to Plaintiff was a foreseeable consequence of Defendants' anticompetitive conduct, which was done with the intent of monopolizing the relevant markets.

### CLAIM 7: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP AND/OR EXPECTANCY AGAINST VOLKSWAGEN DEFENDANTS

166.  Plaintiff incorporates by reference the allegations in all preceding paragraphs.

167.   Plaintiff had a valid business relationship and/or expectancy in the contracts with the Tier 1 Defendants for the sale of automotive seat covers. Prevent had more than a subjective belief that it would complete these contracts because it was a supplier in the competitive bidding process with both Tier 1 Defendants and was a price-leader in those products.

168.   Volkswagen and Brandstätter knew about the relationships or expectancies between Plaintiff and Tier 1 Defendants because Volkswagen explicitly entered an agreement with Tier 1 Defendants not to purchase products from Plaintiff.

169.   Volkswagen and Brandstätter intentionally interfered in the relationship or expectancy between Plaintiff and Tier 1 Defendants.  But for Volkswagen's interference—overseen and executed in large part by Brandstätter, Tier 1 Defendants would have contracted with Plaintiff for the sale of automotive seat covers.

170.   Volkswagen and Brandstätter's conduct satisfies the wrongful act requirement because:

(a)   Volkswagen and Brandstätter's conduct is anticompetitive, violating federal and state antitrust law;

(b)   Volkswagen and Brandstätter's conduct amounts to the Michigan tort of civil conspiracy; and

(c)     Volkswagen and Brandstätter acted with malice and without a valid business justification because the interference served no legitimate business or economic purpose.

171.   Volkswagen and Brandstätter were not motivated by legitimate business reasons.  Volkswagen does not have a legitimate business justification for its interference.

172.   Volkswagen and Brandstätter's interference was the direct and proximate cause of Plaintiff's inability to bid on Tier 1 Defendant contracts and ultimately obtain those contracts.

173.   As a direct and proximate result of Volkswagen and Brandstätter's conduct, Plaintiff suffered damages.

## CLAIM 8:  CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

174.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

175.   Volkswagen Defendants and the Tier 1 Defendants combined, through concerted action, to accomplish an unlawful purpose.

176.   The purpose of this conspiracy was unlawful because:

(a)     The agreements were an unlawful restraint of trade in violation of state and federal antitrust law; and

(b)     Volkswagen Defendants' conduct amounts to tortious

interference with a business expectancy in violation of state law.

177.    Volkswagen Defendants and Tier 1 Defendants acted together under a

common plan or design.

178.    As a direct and proximate result of the conspiracy, Plaintiff was

injured and suffered damages.

## XI.     <u>REQUEST FOR RELIEF</u>

179.    Plaintiff requests the following relief:

(a)     A jury verdict for the compensatory damages sustained by

Plaintiff, in an amount to be determined at trial, but currently estimated to be in

excess of $180 million;

(b)     A judgment against Defendants, by the Court, in treble the

amount of the jury verdict, and for attorneys' fees, costs, and interest under Section

15 of the Clayton Act, 15 U.S.C. § 15;

(c)     A permanent injunction under Section 16 of the Clayton Act, 15

U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and

from practices that facilitate those violations;

(d)     Restitution and disgorgement; and

(e)     Such other and further relief as the Court deems just and

proper.

## XII.  **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:   November 30, 2020                    Respectfully submitted,

**ZAUSMER, P.C.**
/s/*Mark J. Zausmer*
Mark J. Zausmer (P31721)
Mischa M. Boardman (P61783)
32255 Northwestern Highway
Farmington Hills, MI 48334
(248) 851-4111
*mzausmer@zausmer.com*

**BOIES SCHILLER FLEXNER LLP**
Duane L. Loft
Brianna S. Hills
55 Hudson Yards
New York, NY 10001
(212) 446-2300
*dloft@bsfllp.com*

*Attorneys for Plaintiff*