UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PREVENT DEV GMBH,

Plaintiff,

v.

ADIENT PLC, ET AL.,

Defendant.

_____/

Case No. 20-cv-13137

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER GRANTING ADIENT AND LEAR'S MOTION TO DISMISS (ECF NO. 21) AND GRANTING VOLKSWAGEN AND BRANDSTÄTTER'S MOTION TO DISMISS (ECF NO. 35)

### I.   INTRODUCTION

Plaintiff Prevent DEV GmbH ("Prevent") filed this antitrust action against Defendants Adient PLC ("Adient"); Lear Corporation ("Lear"); Volkswagen, AG ("Volkswagen"); and Ralf Brandstätter ("Brandstätter") for an alleged boycott. ECF No. 1.  Specifically, Prevent alleges Defendants have unlawfully conspired to exclude it from the automotive seat cover market in violation of the Sherman Act and the Michigan Antitrust Reform Act.  *Id*.  Plaintiff also brings claims for tortious interference and civil conspiracy.  *Id*.  Prevent thus seeks damages and injunctive relief under Sections 15 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

Presently before the Court are Adient and Lear's Motion to Dismiss, filed on January 25, 2021, and Volkswagen and Brandstätter's Motion to Dismiss, filed on

March 10, 2021.  ECF Nos. 21, 35.  The matters are fully briefed, and a hearing was held on September 21, 2021.  On November 9, 2021, Volkswagen and Brandstätter filed a notice informing the court of a decision by the United States Court of Appeals for the Sixth Circuit Court in a related case, *Prevent USA Corp. v. Volkswagen AG*, No. 21-1379, 2021 WL 5176952 (6th Cir. Nov. 8, 2021), and Prevent filed a response the next day.  ECF Nos. 48, 49. For the following reasons, the Court **GRANTS** Adient and Lear's Motion to Dismiss [#21] and **GRANTS** Volkswagen and Brandstätter's Motion to Dismiss [#35].

## II.   BACKGROUND

### A. Factual Background

The automotive seating market consists of a three-tiered supply chain.  ECF No. 1, PageID.17.  Specifically, it consists of Tier 3 suppliers, which sell raw or nearly raw materials like metal, plastic, textiles, and leather; Tier 2 suppliers, which make component parts; and Tier 1 suppliers, which incorporate the Tier 2 components into complete seats that they then sell to large carmakers, or Original Equipment Manufacturers ("OEMs").  *Id.* at PageID.16-19.

Prevent "is a corporation organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany."  *Id.* at PageID.13. "Plaintiff's business includes operating as a 'Tier 2' supplier of seat covers, typically supplying seat covers to the Tier 1 suppliers."  *Id.* at PageID.4.

Defendant Adient "is a corporation organized and existing under the laws of Ireland, with its principal place of business in Plymouth, Michigan," while Defendant Lear "is a corporation organized and existing under the laws of Delaware with its principal place of business in Southfield, Michigan." *Id.* at PageID.13-14. Defendants Adient and Lear are "Tier 1" suppliers, which "supply full automotive seats directly to carmakers like Volkswagen, General Motors, and Daimler." *Id.* Adient and Lear also operate as Tier 2 suppliers, *id.* at PageID.25-26, and thus compete against Prevent in the automotive seat covers market.

Defendant Volkswagen is "a corporation organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany." *Id.* at PageID.15. Volkswagen is an OEM and "the largest manufacturer of passenger vehicles in the world by sales volume." *Id.* Defendant Brandstätter is domiciled in or near Wolfsburg, Germany. *Id.* He has been the Chief Executive Officer of Volkswagen since June 2020 and was the Chief Operating Officer from August 2018 until then. *Id.*

Plaintiff alleges that, in 2016, Prevent Group, with which Plaintiff is associated, became embroiled in a global dispute with Defendant Volkswagen over a supply stoppage. *Id.* at PageID.29. "In response, Volkswagen launched 'Project 1,' a highly organized campaign to 'demolish' Plaintiff and the Prevent Group and to exclude them systematically from the market." *Id.* at PageID.4. Allegedly, led

by Brandstätter, *id.* at PageID.30-31, Volkswagen approached all four major Tier 1 automotive seat suppliers with an agreement to boycott Prevent from their business across all OEMs in exchange for guaranteed future contracts with Volkswagen, *id.* at PageID.34-35.  Only Adient and Lear, which allegedly controlled 56% and 22% of the global automotive seat market in 2017 respectively, *id.* at PageID.24-25, agreed to engage in the scheme.[1]  *Id.* at 35.

Plaintiff contends Volkswagen proposed this agreement despite it being "against Volkswagen's rational economic interest" since Prevent "was the cheapest, most efficient competitor."  *Id.* at PageID.34.  And, in 2018, Adient and Lear "abruptly" cut ties with Prevent and stopped sending Requests for Quotes ("RFQ") for potential new business.  *Id.* at PageID.37.

Prevent alleges it learned about the boycott because in 2017, it "received an anonymous letter and internal Volkswagen documents[] . . . from a person claiming to have first-hand information about Volkswagen's Project 1 strategy to destroy Plaintiff and the Prevent Group."  *Id.* at PageID.6.  Representatives of the Prevent Group subsequently notified German authorities and the Volkswagen Board.  *Id.* at PageID.6-7.

---

[1] The Court acknowledges Defendants Adient and Lear dispute the characterizations of their market share in 2017.  Nevertheless, the Court declines to resolve this dispute because the market share did not ultimately play a role in the Court's analysis.

Additionally, a member of the Project 1 team provided *Business Insider* information and over fifty hours of audio recordings of more than thirty Project 1 meetings from 2017 to 2018.  *Id.* at PageID.6.  *Business Insider* began reporting on Project 1 in July 2020, including "the Project 1 group discussing how to redirect Plaintiff's business to Adient."  *Id.* at PageID.7.  After an internal investigation, Volkswagen identified the source as a manager named Christian Minkley.  *Id.*  He has since died in "unusual" circumstances, but he left notes indicating his manager directed him to record the Project 1 meetings.  *Id.* at PageID.7-8.

Plaintiff also claims its allegations are based on "information from other suppliers[] and other sources with direct evidence of these facts."  *Id.* at PageID.8.

## B. Procedural Background

Since 2016, the Prevent Group, Volkswagen, and their affiliates have been engaged in extensive litigation related to Project 1 in German courts.  ECF No. 21-3, PageID.779.  These disputes are ongoing, ECF No. 21, PadeID.147, and discussed in further detail *infra* at III.A.4.  Then, in November 2019, two Prevent Group affiliates brought the Project 1 dispute to this district.  *See Prevent USA Corp. et al. v. Volkswagen AG,* 19-cv-13400-BAF-EAS.  This case was ultimately dismissed on *forum non conveniens* grounds, *Prevent USA Corp. v. Volkswagen AG*, No. 19-CV-13400, 2021 WL 1087661, at *17 (E.D. Mich. Mar. 22, 2021), which the United States Court of Appeals for the Sixth Circuit affirmed, *Prevent*

*USA*, 2021 WL 5176952, at *7. As with the litigation in Germany, this lawsuit is discussed in greater detail at III.A.4 *infra*.

Prevent filed the instant action on November 30, 2020. Prevent is suing all four Defendants for an unlawful agreement in restraint of trade in violation of the Sherman Act § 1 (Claim 1) and Michigan Antitrust Law, M.C.L. § 445.772 (Claim 4), as well as for civil conspiracy (Claim 8). Additionally, Prevent is bringing claims against Adient and Lear for monopsonization or attempted monopsonization in violation of the Sherman Act § 2 (Claims 2 and 3) and Michigan Antitrust Law, M.C.L. § 445.773 (Claims 5 and 6). Finally, Prevent is bringing a tortious interference claim against Volkswagen and Brandstätter (Claim 7).

Adient and Lear filed a joint Motion to Dismiss on January 25, 2021. ECF No. 21. They aver (1) Prevent's claims under the Sherman Act are barred by the Foreign Trade Antitrust Improvements Act of 1992 ("FTAIA"), (2) the case is not properly in this district under the doctrine of *forum non conveniens*, (3) Prevent fails to state a Sherman Act § 1 claim, (4) Prevent fails to state a Sherman Act § 2 claim, (5) Prevent does not establish antitrust injury, and (6) the derivative state law claims should also be dismissed. Prevent filed a response on March 1, 2021, ECF No. 24, and Adient and Lear timely replied, ECF No. 37.

On March 10, 2021, Volkswagen and Brandstätter also filed a joint Motion to Dismiss. In it, they argue (1) the case is not properly in this district under the

doctrine of *forum non conveniens*, (2) Prevent fails to plead personal jurisdiction as to either Defendant, (3) Prevent fails to state a Sherman Act § 1 claim, and (4) the derivative state law claims should also be dismissed.  Prevent filed its response on March 31, 2021, ECF No. 40, and Volkswagen and Brandstätter timely replied, ECF No. 41.

### III.    LAW & ANALYSIS

### *A.* The Court Will Dismiss Prevent's Claims on the Basis of *Forum Non Conveniens*

As stated above, the defendants move for dismissal on several grounds; however, Defendants' *forum non conveniens* arguments are persuasive and dispositive as to all Defendants.  For the following reasons, the Court concludes the case should be handled in Germany.

Under the doctrine of *forum non conveniens*, "a district court may decline to exercise its jurisdiction" if it would be more convenient to resolve the claims in another forum.  *Hefferan v. Ethicon Endo-Surgery, Inc.*, 828 F.3d 488, 492 (6th Cir. 2016).

> When courts apply *forum non conveniens*, there are three considerations: (1) whether an adequate alternative forum is available; (2) whether a balance of private and public interests suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court; and (3) the amount of deference to give the plaintiff's choice of forum.

*Jones v. IPX Int'l Equatorial Guinea, S.A.*, 920 F.3d 1085, 1090 (6th Cir. 2019).

*Forum non conveniens* analysis is fact dependent.  *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549, 557 (1946).  Moreover, it "does not turn on any one factor." *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 831 (6th Cir. 2009) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250 (1981)).  "There is no requirement in *Piper* that the burden be 'oppressive,' though an oppressive burden would be sufficient."  *Gering v. Fraunhofer-Gesellschaft e.V.*, No. 05-73458, 2009 WL 2922847, at *3 (E.D. Mich. Sept. 9, 2009) (quoting *Stewart v. Dow Chemical*, 865 F.2d 103, 106 (6th Cir.1989)).

### 1. The Doctrine of *Forum Non Conveniens* is applicable to Antitrust Cases

As a threshold matter, the Court briefly addresses Plaintiff's contention "that cases under the U.S. antitrust laws can *never* be dismissed in favor of a foreign court on grounds of *forum non conveniens*."  ECF No. 24, PageID.707 (citing *Indus. Inv. Dev. Corp. v. Mitsui & Co.*, 671 F.2d 876, 890 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007 (1983); *Laker Airways Ltd. v. Pan Am. World Airways*, 568 F. Supp. 811, 818 (D.D.C. 1983)).

When the instant motion was briefed and argued, the United States Court of Appeals for the Sixth Circuit had not yet addressed this issue.  However, since then—while deciding the related case *Prevent USA*—the Sixth Circuit rejected Plaintiff's position and held "nothing in [the special venue provision of the Clayton

8

Act] indicates that the district court may not dismiss a case for refiling in a foreign country." 2021 WL 5176952, at *6. The Sixth Circuit thus upheld the district court's dismissal of the plaintiff's Sherman Act and state law claims on *forum non conveniens* grounds. *Id.* at *7. Accordingly, the Court will proceed with the *forum non conveniens* analysis.

### 2. Germany is an Adequate Alternative Forum

There exists an adequate alternative forum when "the defendant is 'amenable to process' in the foreign jurisdiction." *Wong*, 589 F.3d at 830 (quoting *Piper Aircraft Co.*, 454 U.S. at 255 n. 22). The "alternative forum is inadequate if 'the remedy provided by [it] is so clearly inadequate or unsatisfactory that it is no remedy at all." *Id.* at 831 (quoting *Piper Aircraft Co.*, 454 U.S. at 254). There is no remedy at all when, "for example, the jurisdiction 'does not permit litigation of the subject matter of the dispute.'" *Hefferan*, 828 F.3d at 494-95 (quoting *Piper Aircraft Co.*, 454 U.S. at 255 n. 22). The remedy in the alternative forum does not need to be the same as would be provided by an American court. *Id.* at 495 ("Law that is simply less favorable to the plaintiff in the alternative forum is not so extraordinary as to render that forum inadequate."). In particular, a forum is not "inadequate simply because of the likelihood of lesser damages." *Id.*; *see also Prevent USA*, 2021 WL 5176952, at *3 ("But the reality that the foreign venue

9

makes it more difficult to establish the claim or that the foreign law is less

generous to prevailing plaintiffs does not establish unavailability.").

Germany is an adequate alternative forum in which to litigate this dispute.

First, Germany is available as an alternative forum.  Defendant Volkswagen is a

German corporation, and Defendant Brandstätter is a German resident, so both are

amenable to process in that jurisdiction.  Moreover, Defendants "Adient and Lear

both have substantial operations in Germany and are willing to accept service

there."  ECF No. 21, PageID.157 (citing ECF Nos. 21-3, 21-4).

Prevent has expressed concerns that "consent to service does not mean that a

German court will accept jurisdiction or otherwise agree to adjudicate the case."

ECF No. 24, PageID.708.  Prevent does not indicate why a German court would

not accept jurisdiction over the case—especially given the ongoing litigation in

Germany between the Prevent Group and Volkswagen over Project 1.   Instead,

Prevent relies on *Associação Brasileira de Medicina de Grupo v. Stryker Corp.*,

891 F.3d 615 (6th Cir. 2018) to say that a defendant's willingness to accept service

is irrelevant.  ECF No. 24, PageID.708 (citing *Stryker*, 891 F.3d at 621).  Prevent

overstates the *Stryker* holding.  In that record, there was no evidence the defendant

had any connection to Brazil or that Brazilian courts permitted litigation over the

subject matter at issue.  *Stryker*, 891 F.3d at 622.  Thus, the Sixth Circuit held the

defendant's single statement in a brief that it consented to jurisdiction in Brazil was insufficient to show Brazil was an available and adequate forum.

That is the opposite of the situation in the present case. Prevent itself alleged that Adient and Lear have close and "significant" business relationships with Volkswagen, a German company, ECF No. 1, PageID.26-27, and that they engaged in this boycott to deepen those relationships. Given, Adient and Lear's regular contact with German commerce, there is evidence before the Court that Adient and Lear have connections with Germany sufficient to form the basis of jurisdiction.

Additionally, there is sufficient evidence that Germany permits litigation over the subject matter at issue. The Prevent Group has already brought claims in German courts based on Project 1, generally, and the termination of agreements to supply seat backrests, in particular. ECF No. 21, PageID.157 (citing ECF Nos. 21-3, 21-3-15). Moreover, a plaintiff asserting claims assigned to it by Prevent (and six other members of the Prevent Group) recently brought a case in Germany alleging antitrust claims against Volkswagen that include the abrupt termination of Prevent's seat cover contracts in March 2018. ECF No. 35-11, PageID.1609, PageID.1632-35, PageID.1669.

> [T]he fact that Prevent Group companies have filed several lawsuits against VWAG and its subsidiaries in German courts for unfair competition and antitrust violations arising from their alleged

11

> execution of Project 1 is powerful evidence that plaintiffs themselves
> recognize Germany as an available and adequate forum for the
> litigation of such disputes.

*Prevent USA*, 2021 WL 1087661, at *9 (citing *Faber-Plast GmbH v. Kleinert*, 997

F. Supp. 846, 847 (E.D. Mich. 1998)).  To quell any lingering concerns, the Court

will condition the *forum non conveniens* dismissal on Adient and Lear's consent to

suit and acceptance of process in Germany.  *See Stryker*, 891 F.3d at 621 (citing

*Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 611, 616 (6th Cir. 1984). [2]

Second, German courts would be able to provide an adequate remedy.

Plaintiff's claims can be brought in Germany.  Germany has antitrust laws which

cover the exercise of monopoly/monopsony power and boycott.  ECF No. 21,

PageID.157 (citing ECF No. 21-5); *see also* ECF No. 35-11 (translation of antitrust

lawsuit based on Project 1 filed by assignee of Plaintiff and six other Prevent

Group companies against Volkswagen and other defendants).

Prevent contends that Germany is inadequate because "German antitrust law

would apply 'only with respect to the effects of the Defendants' conduct on the

German market, but not with respect to the effects of that conduct on the U.S. and

---

[2] *See also Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 766 (6th Cir. 2016) ("Goodyear U.S. has repeatedly agreed to submit to French jurisdiction for the claims asserted in Plaintiffs' amended complaint.  So unless Plaintiffs can show that France would decline jurisdiction or otherwise provides a "clearly unsatisfactory" remedy, Goodyear U.S. has shown an adequate alternative forum.")

other markets.'"  ECF No. 24, PageID.709 (quoting ECF No. 25).  However, in

*Prevent USA*, the Sixth Circuit concluded a German-based antitrust lawsuit would

likely reach more conduct and injuries than an American-based one.  *Prevent USA*,

2021 WL 5176952, at *3.  In Germany, Prevent may also bring antitrust claims

under European law and could thus include in its cause of action anticompetitive

effects across the European Union.  *Id*.  In contrast, a Sherman Act claim cannot

reach foreign conduct that produces only anticompetitive harm abroad.  *Id*.

Indeed, the Court notes it is not at all clear Prevent has alleged domestic

harm sufficient to bring a Sherman Act claim.  The Complaint does not allege

Volkswagen, Adient, or Lear ever bought, or refused to buy, seat covers from

Prevent for import into the United States.  Instead, Plaintiff alleges that from 2015

to 2017, Prevent sold seat covers to Adient for the Volkswagen Passat.  ECF No. 1,

PageID.28.  Plaintiff also alleges Volkswagen assembles the Passat in Tennessee.

*Id*.  Notably, Plaintiff does not allege Adient exclusively used its seat covers in

manufacturing seats for the Passat, Volkswagen exclusively used Adient's seats in

assembling the Passat, or the Passat is exclusively manufactured in Tennessee.

The Court is thus left to make these assumptions and infer that, at least between

2015 and 2017, Prevent's seat covers entered the United States.  Prevent asks too

much—especially because Adient and Lear raised this point in their Motion to

Dismiss, *see* ECF No. 21, PageID.152, and Prevent did not address it.  This cause

of action consists of a German company initiating the boycott of another German

company and goods that are not alleged to have been imported into the United

States, a German court should have jurisdiction over the conduct at issue.

Equally unavailing is Prevent's argument that Germany is inadequate

because "its courts are not empowered to award treble damages, compel

meaningful party discovery, or compel any third-party discovery at all."  ECF No.

24, PageID.709.  Again, a forum is not "inadequate simply because of the

likelihood of lesser damages."  *Hefferan*, 828 F.3d at 495.  As to the procedural

differences between Germany's legal system and the American one, various courts,

including the Sixth Circuit, have found that the German legal system is adequate.

*See, e.g.*, *id.* ("The differences in Germany's legal system do not reveal an

alternative forum that provides a remedy 'so clearly inadequate or unsatisfactory'

that it is 'no remedy at all.'") (quoting *Piper Aircraft*, 454 U.S. at 254); *Prevent*

*USA*, 2021 WL 5176952, at *3 (holing Germany was an adequate forum to hear

Prevent Group plaintiffs' antitrust case).  Moreover, Plaintiff's assignee and other

Prevent Group affiliates have already availed themselves of the German courts

based on the same underlying conduct.  *See Faber-Plast,* 997 F. Supp. at 847

(finding Germany to be an adequate alternative forum in part because "the parties

have engaged, and indeed continue to engage, in litigation in Germany, and a

substantial part of the events giving rise to the instant suit occurred in Germany").

Accordingly, for the foregoing reasons, the Court concludes the Germany is an adequate alternative forum this lawsuit.

### 3.  The Balance of Public and Private Interests Favor Transfer

"If an adequate alternative forum is available, then courts examine whether the plaintiff's choice of forum is unnecessarily burdensome.  *Zions First Nat. Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 523 (6th Cir. 2010).  To guide that analysis, courts look to the private and public interests that the Supreme Court listed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)."  *Jones*, 920 F.3d at 1092.

#### i.    Private Interests

In *Gulf Oil*, the Supreme Court announced a non-exhaustive list of private interests to consider, including, "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive."

*Jones*, 920 F.3d at 1092 (quoting *Gulf Oil Corp.*, 330 U.S. at 508).  The Sixth Circuit has also considered whether "documents and witnesses will likely require translation to English."  *Solari*, 654 F. App'x at 768; *see also Prevent USA*, 2021 WL 5176952, at *4.

Here, the private interests strongly favor litigation in Germany.  Prevent alleges Defendant Volkswagen, a German company, developed the idea for Project

1 and approached Defendants Adient and Lear with the boycott scheme to

"demolish[] [Prevent] as a supplier of seat covers."  ECF No. 1, PageID.5.  It

further alleges Defendant Brandstätter, a German resident, oversaw the planning

and execution of Project 1 and gave detailed updates to Volkswagen's Board,

including Chairman Herbert Diess, whom the Complaint specifically names.  *Id.* at

PageID.30.  Diess and the other Board members will be key witnesses in the

litigation.  Despite their importance to the case, they would be outside of this

Court's subpoena power.[3]  *See Gering*, 2009 WL 2922847, at *4 (finding private

interests favored dismissing the case to Germany because "[t]his Court does not

have the authority to compel foreign witnesses to appear and testify in the Eastern

District of Michigan, and the overwhelming majority (if not all) of the potential

witnesses in this case are foreign witnesses").

---

[3] Prevent argues that Adient and Lear, as domestic defendants, "bear the burden of identifying specific witnesses who would be unwilling to testify in this forum and establishing their relevance to the case."  ECF No. 24, PageID.710-11 (citing *Hefferan*, 828 F.3d at 498–99).  Prevent is correct that the *Hefferan* court held that the availability of compulsory process "receives less weight when it has not been alleged or shown that any witness would be unwilling to testify."  *Id.* at 499 (internal quotation marks omitted).  Nevertheless, despite this lack of specificity, the Sixth Circuit affirmed the district court's dismissal of the Hefferans' case because "[r]elative ease of access to sources of proof and the availability of compulsory process for proceedings abroad support dismissal."  Similarly, Adient and Lear's failure to specifically allege that certain foreign witnesses will not testify in the United States is not fatal to their *forum non conveniens* argument.

Additionally, many of the exhibits submitted by all parties have been translated from German into English.  *See, e.g.*, ECF No. 1-3.  And most of the factual allegations in the Complaint are based on internal Project 1 documents that were originally written in German.  *Id.* at PageID.30 n. 5 ("Quotes of written Volkswagen materials throughout the Complaint are unofficial translations from German.").  It stands to reason that much of the evidence in this case will continue to be in German, which supports dismissing the case for litigation in Germany. *See Gering*, 2009 WL 2922847, at *4 ("The fact that a jury in the Eastern District of Michigan will be comprised of English-speaking persons (presumably similarly lacking knowledge of the German language) likewise strongly disfavors trying this case in the Eastern District of Michigan.").

Prevent alleges "[e]mployees of Adient and Lear regularly met with C-suite level executives from Volkswagen in Michigan and discussed Project 1 initiatives and measures.  ECF No. 1, PageID.35.  Then, at the hearing, Prevent named specific employees it averred would be key witnesses and are domiciled in Michigan.  Similarly, in its response to Volkswagen and Brandstätter's notice regarding *Prevent USA*, Prevent again argued the evidence of, and key witnesses to, the alleged conspiracy between Volkswagen and Adient and Lear is in Michigan.  ECF No. 49, PageID.2878-79.

While some Adient and Lear employees may be key witnesses and may be based in Michigan, the Court concludes access to sources of proof would still be relatively easier in Germany.  Adient and Lear have consented to litigating this matter in Germany and have agreed to make available in Germany any documents or personnel under their control in Michigan.  ECF No. 21, PageID.159 n. 13 (citing ECF Nos. 21-4, 21-5).  Furthermore, Brandstätter, who allegedly oversaw Project 1, participated in calls with Adient and Lear from Germany, so even those meetings have a German nexus.  Additionally, the Volkswagen executives who met with Adient and Lear employees in Michigan are already available in Germany.  While some of the evidence in this case may be in Michigan, "the bulk of the documents and records constituting necessary proof in the litigation are located in" Germany, *Barak v. Zeff*, 289 F. App'x 907, 912 (6th Cir. 2008), and that which is not can be brought there.  Accordingly, the Court finds the private interests favor litigating this case in Germany.

### ii.    Public Interests

Looking again to *Gulf Oil*, the public interests we consider include the administrative difficulties of litigation in congested centers instead of the suit's place of origin, the burden of jury duty on citizens of communities with no relation to the case, the importance of trying the case in view and reach of others that may be affected, the local interest in having localized controversies decided at home, and the appropriateness of having trial at home with the law that governs the case.

*Jones*, 920 F.3d at 1093 (citing *Gulf Oil Corp.*, 330 U.S. at 508-09).  "To evaluate [the public interest] factors, the court must consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to the plaintiff's chosen forum." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528 (1988).

Here, the public interest factors also favor litigation in Germany.  The suit's place of origin is Germany.  Plaintiff alleges Project 1 was developed in Germany.  ECF No. 1, PageID.5.  Plaintiff further alleges that as part of Project 1, Volkswagen "hatched" a conspiracy for a group boycott, in which it convinced Adient and Lear to participate.  *Id.*; *see also id.* at PageID.32-33 (describing internal Volkswagen documents that allegedly detail the boycott plan).  Yet, Prevent now asserts this is a Michigan-based conspiracy because the Complaint alleges Adient and Lear employees met with Volkswagen employees in Michigan.  ECF No. 49, PageID.2878-79.  However, that some of the actions related to the alleged conspiracy occurred in Michigan does not change the fact that the "locus of the alleged culpable conduct," *Biard*, 486 U.S. at 528, is Germany, where Project 1 and this boycott were formulated and managed.

That the cause of action is German in nature is evidenced by the fact that Plaintiff's assignee is currently litigating the termination of these

contracts in Germany.  *See* ECF No. 35-11.  Additionally, as discussed *infra*

at III.A.4, there are already several related cases in Germany between

Prevent Group affiliates and Volkswagen arising from the 2016 supply

stoppage and Project 1 schemes.  "The importance of trying the case in view

and reach of others that may be affected, [and] the local interest in having

localized controversies decided at home" weigh in favor of litigating this

dispute in Germany among its brethren.  Judicial economy favors removing

the case to Germany as well.[4]

Furthermore, it appears the presence of foreign defendants in this case

has already caused some administrative difficulties: Volkswagen and

Brandstätter were not served with the Summons and Complaint until late

February 2021, almost three months after the complaint was filed.  *See* ECF

Nos. 39, 43.  And, as discussed *supra* at III.A.3.i, it appears much of the

evidence is in German and/or Germany.

---

[4] The Court acknowledges Prevent's assertion that Adient and Lear are not named
in any of the German lawsuits and thus the actions cannot be called "parallel."
ECF No. 40, PageID.2399.  Nevertheless, Prevent assigned claims arising from the
March 2018 termination of its seat cover supply agreements to an entity
established to bring such claims on behalf of the Prevent Group.  *See* ECF No. 35-
11, PageID.1669.  While Adient and Lear are not named in that litigation, the
complaint refers to the third parties that replaced them as Volkswagen's suppliers.
*Id.* at PageID.1609.  It is clear these lawsuits are related, if not "parallel."

Prevent asserts "Germany has an interest only in its own market, not the worldwide market alleged in the Complaint.  By contrast, a 'defendant's home forum always has a strong interest in providing a forum for redress of injuries.'"  ECF No. 24, PageID.710 (quoting *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 952 (D.C. Cir. 2019)) (internal citations omitted).  While the Court generally agrees with this principle, it is ultimately unhelpful in this case as Germany is the home forum for half the Defendants.  Moreover, as discussed *supra* at III.A.2., a German court's interest would extend to anticompetitive conduct throughout the European Union.  *Prevent USA*, 2021 WL 5176952, at *3.  In contrast, a Sherman Act claim brought in the United States can only address domestic effects.  *Id*.

The Court acknowledges citizens of Michigan have some relation to this case to the extent meetings regarding the alleged boycott occurred in Michigan.  Nevertheless, the boycott itself was an agreement initiated by a German company (Volkswagen) to boycott another German company (Prevent), and that the goods subject to the boycott (seat covers) are not alleged to have ever been imported into the United States.  A handful of meetings in Michigan is not a sufficient connection to outweigh the foreign nature of the suit.  Accordingly, the public interests also favor litigating this case in Germany.

21

### 4.  Deference to Plaintiff's Choice

Generally, courts "apply a strong presumption in favor of a plaintiff's selected forum." *Zions First*, 629 F.3d at 523–24.  It is also usually "reasonable for [a] district court to assume that the choice [of a defendant's home forum] was convenient. *District Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 571 (6th Cir. 2019).  However, a "foreign plaintiff's forum choice is usually accorded less deference" than an American plaintiff's because it is "much less reasonable" to assume the forum is convenient. *Hefferan*, 828 F.3d at 493 (quoting *Piper Aircraft Co.*, 454 U.S. at 256).  This is especially true "as evidence of forum shopping mounts." *Stryker*, 891 F.3d at 619.  Courts consider whether a foreign plaintiff's "decision to file suit in the United States was motived by a legitimate reason such as convenience or the ability to obtain jurisdiction over the defendants rather than tactical advantage." *Id.* at 494.

Here, the Court finds Prevent's choice of forum is entitled to little deference.  Prevent is a foreign plaintiff and therefore entitled to less deference. *Hefferan*, 828 F.3d at 493.  Prevent counters that Adient and Lear are headquartered in this District and cannot seriously claim inconvenience. *See, e.g.*, ECF No. 49, PageID.2877.  However, courts have dismissed on *forum non conveniens* grounds when cases involved both domestic and foreign defendants. *See, e.g.*, *Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015) (affirming dismissal of workplace

discrimination claims brought by American plaintiff living abroad against foreign

corporation and its domestic parent company); *Kryvicky* v. *Scandinavian Airlines*

*Sys.*, 807 F.2d 514 (6th Cir. 1986) (affirming dismissal of wrongful death claims

brought by American plaintiff against foreign airline and domestic airline

manufacturer).

Despite Adient and Lear's connection to Michigan, the Court concludes the

Prevent Group's litigation history evidences foreign shopping.  As discussed *supra*

at III.A.3.ii n.4, the Court acknowledges Prevent, Adient, and Lear, have not been

named parties in the any of the prior lawsuits in Germany.  However, Prevent is

wrong in arguing "[c]ourts will only infer forum shopping when the *same* plaintiff

has brought parallel claims in a foreign court and is seeking to re-litigate an

unfavorable result in the foreign court."  ECF No. 24, PageID.705 (emphasis in

original).  For example, in *Prevent USA*, 2021 WL 1087661, the district court

(Friedman, J.) dismissed on *forum non conveniens* grounds despite neither of the

two plaintiffs, one of which was an American company, being named in the earlier

foreign litigation.

Moreover, Prevent is so closely affiliated with the other Prevent Group

companies that it is disingenuous for Plaintiff to try to separate the instant action

from its predecessors.   In fact, the Complaint is rife with references to the broader

Prevent Group and its dispute with Volkswagen.  A few examples are below.

> In 2016, a global dispute arose between Volkswagen and companies affiliated with Plaintiff known as the "Prevent Group." . . . In response, Volkswagen launched "Project 1," a highly organized campaign to "demolish" Plaintiff and the Prevent Group and to exclude them systematically from the market.

ECF No. 1, PageID.4.

> Project 1 had several dimensions, including interfering with acquisitions by Prevent Group companies that might threaten Volkswagen's market power, hiring private investigators to spy on Prevent Group executives to gain insight into the Prevent Group's acquisition strategy and business, and manufacturing negative press about the Prevent Group.  These aspects of Project 1 are the subject of separate proceedings both in this District and in certain European courts.

*Id.* at PageID.5.

> At one point, Adient was the single largest customer of both Plaintiff and across the entire automotive business of the wider Prevent Group. At the same time, Prevent Group companies would purchase some components from Adient in markets in which Adient was acting as a Tier 3 supplier, including certain fabrics.  In addition, the Prevent Group also provided major product development and pre-serial production services to several of Adient's operations.  The relationship between Plaintiff and Adient was highly successful.

*Id.* at PageID.27

> As Plaintiff grew, it achieved more bargaining power to insist upon competitive prices and terms, directly threatening Volkswagen's strategy of keeping its suppliers small and weak and thereby allowing Volkswagen to force anticompetitive prices and terms on those suppliers. Entities within the Prevent Group began acquiring smaller,

weak suppliers. This posed a direct threat to Volkswagen's market power strategy.

*Id.* at PageID.29.

Volkswagen estimated that the replacement of Prevent Group companies, including Plaintiff, would cost it roughly 200 million euros. . . . The replacement of all Prevent Group companies, including Plaintiff, as suppliers to Volkswagen was approved at the highest levels of the company.

*Id.* at PageID.32-33.

By foreclosing Plaintiff from capturing these returns, Defendants caused loss to Plaintiff's industry goodwill and market reputation, and substantially decreased the overall market valuation of the Prevent Group.

*Id.* at PageID.41

The instant lawsuit is the latest iteration in a long series of lawsuits in which Prevent Group companies have alleged, both in this District and German courts, that Volkswagen and its subsidiaries are trying to drive them out of business. Judge Friedman extensively detailed this litigation history in *Prevent USA*, 2021 WL 1087661.  Because Defendants submitted the same declaration in support of their motions to dismiss, the Court includes Judge Friedman's summary below.

This litigation history is explained in the declaration of Dr. Detlef Hass, ECF 33, submitted in support of defendants' motion. Dr. Hass catalogues the lawsuits that have been litigated in German courts between Prevent Group companies and Volkswagen since 2016.  The first two were brought by VWAG and some of its subsidiaries against

the Prevent Group companies Car Trim GmbH ("Car Trim") and ES Automobilguss GmbH ("Automobilguss") in August 2016 when these suppliers froze all deliveries to Volkswagen.  In each case, the Braunschweig Regional Court found the suppliers' delivery freezes to be unjustified, granted Volkswagen's motions for preliminary injunctions, and ordered the suppliers to resume delivery of parts for specified periods of time.  *See* Hass Decl. ¶¶ 3, 4; Hass Decl. Exs. 1, 2.

A third lawsuit arose in 2018.  In March of that year, Volkswagen informed Automobilguss that it was terminating its supplier contract with that company.  Automobilguss then sued VWAG in the Regional Court of Leipzig and sought an injunction requiring Volkswagen to continue purchasing gear components.  *See* Hass Decl. ¶ 6; Hass Decl. Ex. 3.  The court granted partial relief, but the appellate court, the Higher Regional Court of Dresden, reversed.  Hass Decl. ¶¶ 7-9; Hass Decl. Ex. 4[.]  The appellate court concluded that Volkswagen had good cause to terminate its relationship with [Automobilguss] "in reaction to the illegal threat of the [latter]" to stop supplying gear components.  PageID.1022.  The court also rejected plaintiff's antitrust argument that VWAG had abused its market power, finding that "[t]he Plaintiff did not demonstrate by *prima facie* evidence that the Defendant is a market-dominating company."  PageID.1017.

Prevent Group's legal action against Volkswagen continued in another German court in 2018 when Prevent TWB GmbH & Co KG ("TWB") sued VWAG and two other VW subsidiaries in an effort to require them to continue purchasing its car seat components.  *See* Hass Decl. ¶ 10; Hass Decl. Ex. 5.  Defendants had given notice in March 2018 that they were cancelling their supply agreements with TWB effective March 2019.  The Regional Court of Dortmund noted plaintiff's belief that "the cancellation is simply retribution for the dispute that has been publicized in the media between [VWAG] and two affiliated companies of Plaintiff's parent company, CarTrim GmbH and ES Automobilguss GmbH, dating from 2016."  Hass Decl. Ex. 5

(PageID.1073).  The court denied the injunction.  PageID.1069.  In affirming, the Duesseldorf Higher Regional Court found plaintiff's request for an injunction to be "unfounded" because, among other reasons, plaintiff conceded that it had already found more than ten new customers."  Hass Decl. Ex. 6 (PageID.1136, 1141).

The dispute over VWAG's cancellation of Prevent Group's parts contracts continued in another German court, the Regional Court of Hanover, where TWB sued Skoda Auto a.s., a VWAG subsidiary, in 2018. Hass Decl. ¶ 12. That court, like the Regional Court of Dortmund (and for essentially the same reasons), denied plaintiff's request for an injunction to compel defendant to continue buying car seat components after defendant canceled its contract in early 2018. Hass Decl. Ex. 7.  Plaintiff appealed this decision to the First Antitrust Division of the Celle Higher Regional Court[] but withdrew the appeal after that court indicated that it intended to dismiss the appeal because it "clearly has no chance of succeeding."  Hass Decl. ¶ 13, Hass Decl. Ex. 8 (PageID.1247).

Another in this continuing series of disputes between VWAG and Prevent Group is a lawsuit brought by VWAG against Neue Halberg-Guss GmbH ("NHG"), a supplier of engine blocks and other components, in the Regional Court of Braunschweig in 2018.  Hass Decl. ¶ 19, 20; Hass Decl. Exs. 12, 13.  In that case, VWAG obtained an order permitting it to attach NHG's assets in the amount of 42 million Euros.  The basis for the claim was that NHG, upon being acquired by the Prevent Group, massively increased the prices it demanded VWAG pay as a condition of continued delivery.  Hass Decl. Exs. 13 (PageID.1633-35).  VWAG paid the demanded prices, which the court characterized as "usurious," in order to avoid production shutdowns at its engine plant.  PageID.1650, 1654.  In affirming, the appellate court agreed that NHG's significant price increases were usurious and that NHG's threatened "delivery stop caused an economic predicament for [VWAG], which at the time was dependent on deliveries from [NHG] because alternatives were—

undisputedly—not available in a timely manner." Hass Decl. Ex. 14 (PageID.1735).

The most recent [German] battle between VWAG and Prevent Group took shape in December 2019, when a company named Andromeda Dispute & Litigation GmbH ("Andromeda") sued VWAG, Audi AG, Porsche AG, Skoda Auto a.s., SEAT S.A., SITECH Sitztechnik GmbH, Volkswagen Automatic Transmission Co. Ltd. No. 125, and Volkswagen R GmbH in the Regional Court of Frankfurt.  Hass Decl. ¶ 22, Hass Decl. Ex. 15.  Plaintiff indicated that it was suing by assignment on behalf of several Prevent Group companies whose contracts with the VW companies had been terminated in March 2018.  Hass Decl. Ex. 15 (PageID.1788).  In this lawsuit, plaintiff asserts claims "on the basis of contractual and criminal law, and in particular antitrust law" for these unlawful terminations.  *Id.*  VWAG, plaintiff alleges, "had strategically prepared for this separation for years."  PageID.1789.  Plaintiff points to a Project 1 presentation in April 2017 for VWAG's board where the company's "separation costs" were tallied.  *Id.*  VWAG allegedly intended that "[a]ll suppliers should see what happens when they do not strictly follow the unwritten laws of [VWAG]; for, in 2016, individual companies of the 'Prevent Group' had dared to suspend delivery." *Id.* VWAG allegedly intended "to 'eliminate' all of the companies of the 'Prevent Group.'"  PageID.1790.  According to the complaint, VWAG believed that "the strategy of the 'Prevent Group' that had been pursued for years – the acquisition and recovery of small and mid-sized automotive supply companies – had to be halted."  *Id.*  VWAG allegedly

> created a "List of problematic suppliers," which
> recorded, among other things, financial assessments for
> each supplier, the dependence of the supplier on
> [VWAG] in percentage of revenue, a "depth evaluation"
> for each supplier, the plans of Volkswagen for handling
> the supplier, and, in the column "Status," all information
> regarding a change of control.  On the other hand, a

concept was needed for the replacement of the companies
that supplied [VWAG] and its corporation [sic].

. . .

Now, with great urgency, replacement suppliers needed
to be found for all parts delivered by companies of the
"Prevent Group" and – this was planned for "February
2018" – in one fell swoop, all contracts of all companies
of the corporation of Defendant No. 1) with companies of
the "Prevent Group" were annulled, terminated properly
or without notice, and this action was accompanied by a
great media presence in order to demonstrate to all
suppliers the consequences of "insubordinate behavior."

PageID.1790, 1792. As evidence, plaintiff references a Project 1
presentation in April 2017 to VWAG's board. PageID.1792.

The complaint goes on to allege:

The conduct of the Defendants was and is illegal in many
respects.  In March 2018, there were as few "grounds for
termination" for a termination or ending of the contracts
without notice or even with notice before the expiry of
the fixed term as there were in June 2016.

. . .

The concerted action of March 20, 2018, was not only
the contractually based but also antitrust-based and
moreover illegal infringement of an established and
practiced commercial business as well as a malicious,
immoral injury to seven Cedents, because, as they have
declared, Defendant No. 1) and the remaining affiliates
did not pursue any justified economic goals but rather the
targeted public injury of the "Prevent Group."  Defendant
No. 1) lied to the Cedents – as well as to the courts –
regarding its actual plans; it was only gradually – some

29

of it very recently – that the duplicitous double-dealing was uncovered.

PageID.1792-93. Further,

> [i]n order to conceal the negative influences on the assets, the stock market price and the share value of Volkswagen AG, the responsible persons involved temporarily named their project "Project-1," more precisely, in the years 2016 and 2017.  It is not known what further or other code names the destruction campaign had.  In any case, a presentation for the board meeting of the VW Group dated April 25, 2017 (Annex K1) contained a recommendation for action, calling for a complete "modulation" of the "companies of the Prevent Group" (including ES Guss and Car Trim) and for all objectives to be fully implemented by February 2018....Furthermore, the presentation refers to the Group's board meetings dated August 16, 2016 and August 23, 2016, at which the Board of Management of the Group had already decided on the "modulation" - the destruction of all suppliers of the "Prevent Group" and the structure of alternative suppliers.

PageID.1814-15. The complaint also alleges the specific goals of Project 1:

> In any case, on August 16, 2016, the Board of Management of the [Volkswagen] Group decided to "modulate", i.e. boycott the supplier companies of the Hastor family of entrepreneurs, which were no longer wanted for further business.  The Board of Management of the Group determined that
>> (1) a fully secured 2-supplier strategy was to be set up to ensure that all VW plants would be supplied with

automotive parts without using the companies of the
Hastor/Prevent Group;

(2) any participation by the Hastor family of
entrepreneurs in a supply company in the past, present
and future should be examined and prevented;

(3) the legal department should be closely involved in
all activities relating to the companies of this family
of entrepreneurs;

(4) close internal monitoring of developments is
necessary and that the Board of Management of the
Group should report on developments at least weekly
(i.e. again on August 23, 2016).

In view of these determinations, it was clear that the
Board of Management of the Group did not think of
admitting their own mistakes or even of responding to
justified demands from VW Group suppliers. It was also
clear that the VW Group would use all means made
available by the Board of Management to "clean up" all
supply chains and supply companies of Hastor managers
or Hastor holdings as soon as this appeared necessary for
any reason or was deemed necessary as a preventive
measure.

PageID.1815.

The complaint further alleges that Project 1, which the complaint also
referred to as "the destruction campaign," included an effort by the
VW Group

to use its organizational and structural possibilities in the
value-added pyramid for the approximately 11 million
vehicles it produces annually to *deny the assignors
access to new supply contracts for the brands of the VW
Group*.  In addition, the Hastor family and their

> companies willing to invest were *denied access to the supplier market in all markets in which the VW Group was able to exert influence on the award of supplier contracts*, namely in South America, *North America*, Europe[,] and Asia. This included blocking the acquisition of shareholdings in other companies, although the VW group could not have any equity interest of its own in investing Group funds for this purpose.

PageID.1818 (original emphasis omitted; emphasis added).  Project 1 also allegedly sought to block Prevent Group companies from acquiring other suppliers:

> [T]he VW Group has also made every possible effort to exploit its organizational and structuring possibilities in the value-added pyramid for the supply chain controlled by its worldwide in order to prevent companies in which the Hastor family could have had a direct or indirect holding from being taken over.
> . . .
> VW AG, as a listed company, has at no time publicly reported to the capital market that it has been engaged in a campaign of destruction against the companies of the Hastor family of entrepreneurs since at least 2015 and is planning for this dispute both the loss of all deliveries to these companies (and consequently also possible disruptions to assembly at their plants) and costs and claims for damages in the hundreds of millions.

PageID.1844-45.

The complaint asserts antitrust claims, arguing at length that plaintiff had stated a claim under both German and European antitrust law. PageID.1848 et seq.  Plaintiff alleges that VWAG and the named subsidiaries have monopsony power due to their "dominant position with regard to the vendor parts manufactured by the Prevent

companies." PageID.1850. Plaintiff asserts that defendant could be held liable under German antitrust law for "any market conduct which has objectively disadvantageous effects on competition for the party concerned." *Id.* Within its discussion of defendants' antitrust violations, plaintiff alleges:

> In this context, reference should also be made once again to the strategy of the defendant's group management board to try by all means to prevent the takeover of suppliers by companies of the Prevent Group. All this must be taken into account in the necessary balancing of the interests of the companies concerned. The interest of the defendant is clearly directed towards permanently excluding all companies of the Prevent Group as suppliers for all defendants, because it fears that these companies will build up countervailing power and that it will no longer be able to unilaterally enforce its interests in the drafting of contracts, in particular its general terms and conditions of purchase, and in the execution of contracts, as it has done in the past.

PageID.1854. Plaintiff further alleges:

> In the present case, as has been explained, it must be assumed that the defendant has a monopoly-like position in the demand for subcontracted parts, which is manifested in the specific form of the supply contracts. Ultimately, the first objective of the defendant regarding 1. [sic] was not only to consolidate its position of power as a buyer of motor vehicle parts, but to expand it and to make it clear to all other suppliers what consequences they would have to expect if they did not comply with the defendant's requirements.

> PageID.1857. The complaint asserts a slew of claims under German
> law, including antitrust, fraud, unjust enrichment, and interference
> with an "established ... business operation." PageID.1870. Plaintiff
> expands on the latter point, citing authority for the proposition that
> such interference includes "[t]he prevention of planned commercial
> activities of an already active company ..., such as its extension or
> expansion, if the 'internal connection' to an existing company is
> present." PageID.1871.

*Id.* at *12-16.

After this extensive litigation history, in November 2019, two plaintiffs

affiliated with the Prevent Group sued Volkswagen and Volkswagen Group of

America, Inc. in this District for actions related to Project 1.  *See Prevent USA*

*Corp. et al. v. Volkswagen AG,* 19-cv-13400-BAF-EAS.   Specifically, the

plaintiffs argued that the defendants conspired to block Prevent Group affiliates

from acquiring other automobile parts suppliers "with the purpose and effect of

suppressing competition, maintaining Volkswagen's market power over suppliers,

and in the process causing massive losses to [the Prevent Group]."  *Prevent USA*,

2021 WL 1087661, at *2.

One of the plaintiffs in that case, Prevent USA, is a subsidiary of the Prevent

Group, organized and existing under the laws of Pennsylvania, and registered to do

business in Michigan.  The other, Eastern Horizon, is a Dutch company with its

principal place of business in the Netherlands.  One of the defendants in that case,

Volkswagen Group of America, is a New Jersey corporation whose principal place

of business is in Virginia.  The other is the same Volkswagen entity named in the instant case.  Volkswagen and Volkswagen Group of America successfully moved to dismiss the lawsuit based on *forum non conveniens*.

The court (Friedman, J.) found Germany was an adequate forum for the litigation because both defendants were amenable to process there, Germany's legal system was competent to handle a broad array of disputes, and Prevent Group companies were already litigating several unfair competition and antitrust lawsuits against Volkswagen and its subsidiaries based on the Project 1 conduct.  *Id.* at *8-9.  The court found the balance of interests favored litigation in Germany because the case had little connection to Michigan, Project 1 was devised and administered in Germany, and the majority of the evidence was in Germany.  *Id.* at *9-11. Finally, the court gave the plaintiffs' choice of forum little deference because they had little connection to the United States and "Prevent Group companies have brought a number of lawsuits against Volkswagen in Germany, the obviously more convenient and appropriate forum for resolution of their disputes against this German car maker."  *Id.* at *11; *see also id.* at *12-16 (describing Prevent Group's litigation history against Volkswagen in Germany).  The United States Court of Appeals for the Sixth Circuit affirmed.  *Prevent USA*, 2021 WL 5176952, at *.; *see also id.* at *5 ("The convenience of handling this lawsuit in Michigan is not obvious, even from Prevent USA's perspective. Keep in mind that the Prevent

Group brought five different actions in Germany before bringing this American lawsuit.").

The parties dispute whether the Prevent Group is "winning" the litigation in Germany, but the Court need not decide a plaintiff's potential motive for forum shopping—be it to relitigate issues or the opportunity for higher damages.  Given that the bulk of the evidence in this case will be in German or Germany, it is "much less reasonable" to assume Prevent chose this forum for convenience rather than tactical advantage.

For the foregoing reasons, the Court will dismiss the cause of action as to all defendants on *forum non conveniens* grounds.

## B.  Prevent's Antitrust Claims are Barred by the FTAIA

Additionally, the Court finds that Prevent's antitrust claims are barred by the FTAIA.  All Defendants argue that Prevent's antitrust claims are barred by the FTAIA.  ECF No. 21, PageID.152-155; ECF No. 35, PageID.1015.  The Court also finds these arguments persuasive.

"The FTAIA seeks to make clear to American exporters . . . that the Sherman Act does not prevent them from entering into businesses arrangements … however anticompetitive, as long as those arrangements adversely affect only foreign markets."  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004).  To determine whether anticompetitive conduct is subject to Sherman Act liability, a

court must first determine whether "that conduct falls within the FTAIA's general rule excluding the Sherman Act's application," *i.e.*, does the "conduct involv[e] trade or commerce . . . with foreign nations. *Id.* at 158. Then, a court must determine

> whether the conduct nonetheless falls within a domestic-injury exception to the general rule, an exception that applies (and makes the Sherman Act nonetheless applicable) where the conduct (1) has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, and (2) "such effect gives rise to a [Sherman Act] claim."

*Id.* at 159 (quoting 15 U.S.C. §§ 6a(1)(A), (2)).

As a threshold matter, Prevent avers the FTAIA only applies when the Complaint alleges wholly foreign transactions, and it thus cannot apply here where the unlawful agreement was reached in Michigan with companies headquartered in Michigan. ECF No. 24, PageID.702-03. In support of its position, Plaintiff contends Defendants' FTAIA arguments disregard *Empagran*'s holding that "the FTAIA's general rule applies where the anticompetitive conduct at issue is foreign." 542 U.S. at 163.

However, Prevent misconstrues that particular holding in *Empagran*. The Supreme Court was determining whether the FTAIA only applies to export commerce or whether it reaches other types of conduct. *See* 542 U.S. at 163. After analyzing the legislative history, the *Empagran* Court found "that wholly foreign transactions as well as export transactions are covered by the amendment, but that import transactions are not." *Id*. The Supreme Court went on to hold that when

anticompetitive conduct had independent adverse domestic and foreign effects, a domestic purchaser could bring a Sherman Act claim for the domestic injury, but foreign purchaser could not bring a claim based on the foreign harm. *Id.* at 159. *Empagran* is thus inapposite and Prevent has not advanced any authority for this argument.

The other cases Prevent cites are similarly unhelpful to Prevent's argument and instead demonstrate the contrapositive. *TI Inv. Servs., LLC v. Microsoft Corp.* holds the FTAIA does not apply to a United States defendant selling services to United States consumers within the United States but would apply to that same defendant selling services to Indian customers. 23 F. Supp. 3d 451, 468 (D.N.J. 2014). Similarly, *Lotes Co. v. Hon Hai Precision Indus. Co.* holds "[u]nlike claims involving purely domestic conduct, the FTAIA bars claims based on foreign conduct from proceeding unless the foreign conduct has a cognizable effect on the United States." 753 F.3d 395, 406 (2d Cir. 2014). The purpose of the FTAIA is not to exclude wholly foreign conduct as Prevent argued, it is to exclude "conduct that causes only foreign injury." *Empagran*, 542 U.S. at 158.

Prevent's reliance on *In re Auto. Parts Antitrust Litig. (Bearings)*, No. 12-MD-02311, 2014 WL 4209588, at *6 (E.D. Mich. Aug. 26, 2014) is similarly misplaced. *See* ECF No. 24, PageID.703 ("[W]here at least some conduct is alleged to have occurred in the United States, the FTAIA thus does not apply."). As the next

sentence in that opinion makes clear, the *Bearings* court held that the FTAIA arguments only applied to the foreign parent company because the domestic subsidiary was "specifically alleged to manufacture and sell bearings within the United States." *Bearings*, 2014 WL 4209588, at *6.  As discussed *supra* at III.A.2, Prevent did not make any similar allegations in its own Complaint—it does not allege that its seat covers were ever imported into the United States.

Here, the alleged boycott agreement was between two companies headquartered in Michigan and a company headquartered in Germany and concerned another company headquartered in Germany, so it necessarily "involves trade or commerce with foreign nations" and falls within the FTAIA's general rule.  Thus, the Court must determine whether the alleged boycott falls into the FTAIA exception.

Non-import foreign commerce is subject to Sherman Act liability "where the conduct (1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'"  *Empagran*, 542 U.S. at 159 (quoting 15 U.S.C. §§ 6a(1)(A), (2)).  The Court of Appeals for the Sixth Circuit has not yet analyzed the FTAIA exception, and there is a circuit split as to how "direct" the effect on United States commerce must be.  *Compare United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004) (defining "direct" as "an immediate consequence of the defendant's activity"), *with Minn-Chem, Inc.*

*v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (en banc) (defining "direct" as "a reasonably proximate causal nexus").  To be "substantial" the conduct must have more than a "spillover effect on the domestic commerce." *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F. Supp. 1102, 1106–07 (S.D.N.Y. 1984).  The second prong of the FTAIA exception requires "that the domestic effect must proximately cause the plaintiff's injury." *Lotes Co.*, 753 F.3d at 414 (collecting cases).

In *Lotes*, the plaintiff argued the defendants had attempted to gain monopoly power over the entire USB connector industry by refusing to offer licenses to adopters of their technology.  *Id.* at 401.  It further alleged this exclusionary conduct increased prices for devices using USB connectors in the United States.  *Id.* at 402. The defendants contended the plaintiff's Sherman Act claims were barred by the FTAIA.  The United States Court of Appeals for the Second Circuit held it did not need to determine "whether the defendants' foreign anticompetitive conduct has a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce" because "even assuming that Lotes has plausibly alleged a domestic effect, that effect did not 'give [ ] rise to' Lotes's claims." *Id.* at 413 (alteration in original).  Specifically, the court found

> those higher prices did not cause Lotes's injury of being excluded from the market for USB 3.0 connectors—that injury flowed directly from the defendant's exclusionary foreign conduct. Lotes's complaint thus seeks redress for precisely the type of "independently caused foreign

injury" that *Empagran* held falls outside of Congress's intent. *Empagran,* 542 U.S. at 173, 124 S.Ct. 2359.

Indeed, to the extent there is any causal connection between Lotes's injury and an effect on U.S. commerce, the direction of causation runs the wrong way. Lotes alleges that the defendants' patent hold-up has excluded Lotes from the market, which reduces competition and raises prices, which are then passed on to U.S. consumers. Lotes's injury thus *precedes* any domestic effect in the causal chain. And "[a]n effect never precedes its cause." *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 748 F.2d 760, 765 (2d Cir.1984).

*Id.* at 414.

Here, Prevent suffers from the same problem. It alleges Defendants collaborated to exclude it from the global automotive seat cover market and that this exclusion "raised the price and reduced the output of seat covers" which "affected vehicles sold in the United States." ECF No. 1 at PageID.39. But this causal chain goes the wrong way: Prevent's injury precedes any domestic effect Defendants' actions may have had on United States markets. "Accordingly, even assuming that the defendants' anticompetitive conduct caused a 'direct, substantial, and reasonably foreseeable effect' in the United States, any such effect did not 'give[ ] rise to'" Prevent's claim. *Id.* at 415 (alteration in original). Because Prevent has not satisfied both prongs of the FTAIA exception, the Court concludes the Sherman Act claims (Claims 1-3) are barred. This would also serve to bar

Prevent's state law antitrust claims (Claims 4-6).  *In re Auto. Parts Antitrust Litig.*, 2017 WL 7689654, at *7 (E.D. Mich. May 5, 2017).

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes this matter will be dismissed on *forum non conveniens* grounds.  The Court further concludes Prevent's Sherman Act and attendant state law claims are barred by the FTAIA.

Accordingly,

**IT IS ORDERED** Defendants Adient and Lear's Motion to Dismiss [#21] is **GRANTED**.  This dismissal is conditioned on the following:

1. Adient and Lear's consent to suit and acceptance of process in Germany in a civil action arising out of the alleged boycott;

2. Adient and Lear's agreement to make available any documents or witnesses within its control that are necessary for fair adjudication of said action in Germany; and

3. Adient and Lear's consent to pay any judgment rendered against it in Germany in the aforementioned action.

**IT IS FURTHER ORDERED** Defendants Volkswagen and Brandstätter's Motion to Dismiss [#35] is **GRANTED**.

**IT IS SO ORDERED.**

s/Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  November 30, 2021

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 30, 2021, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager